**[J-58-2016]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 709 CAP |
| | : | |
| Appellee | : | Appeal from the Judgment of Sentence |
| | : | imposed on October 9, 2014 in the |
| | : | Court of Common Pleas, York County, |
| v. | : | Criminal Division at No. CP-67-CR- |
| | : | 0006857. |
| | : | |
| TIMOTHY MATTHEW JACOBY, | : | SUBMITTED:  May 10, 2016 |
| | : | |
| Appellant | : | |

## OPINION

**JUSTICE WECHT**[1]                                    **DECIDED:  September 28, 2017**

On October 9, 2014, Timothy Matthew Jacoby was sentenced to death after a jury convicted him of first-degree murder, burglary, tampering with physical evidence, and robbery.[2]  In this automatic direct appeal, we affirm the convictions and the death sentence.

### I.  Background

On March 31, 2010, at 2:52 p.m., the York County 911 call center received a call that originated from Monica Schmeyer's residence on Trone Road in York, Pennsylvania.  When the police arrived, they found Monica Schmeyer dead on her living room floor.  Blood droplets and stains surrounded her body.  The telephone was off the

---

[1]      This case was reassigned to this author.

[2]      18 Pa.C.S. §§ 2502(a), 3502(a), 4910(1), and 3701(a)(1)(i), respectively.

hook; there was blood on the 9 and the 1.  There was also a .32 caliber Speer branded shell casing on the floor near Monica Schmeyer's body.

Jacoby eventually became a suspect in the murder.  The following is a summary of the evidence that the Commonwealth presented to prove that Jacoby killed Monica Schmeyer.

In 2010, Jacoby was a member of an informal group of individuals that gathered at a Hooters restaurant located on Route 30 in York County, Pennsylvania.  The group called themselves the "Orange Shorts Society" ("OSS"), a moniker derived from the uniforms worn by Hooters' waitresses.  The members of the OSS included Jacoby, Sarah Powell (Jacoby's fiancée at the time), Dr. Jon Schmeyer, and Pete Lobianco.

At some of these informal meetings, Dr. Schmeyer talked about his divorce from, and the current state of affairs with, his ex-wife, Monica Schmeyer.  Dr. Schmeyer told the group that he paid Monica $1,700 in alimony each month, in cash.  Monica was known to have a habit of keeping her cash in white envelopes secreted in various places around her home.  Dr. Schmeyer also mentioned that their daughter, Elsa Schmeyer, would be travelling to Japan in March of 2010.

There was an OSS meeting scheduled for March 31, 2010.  On that date, at approximately 2:00 p.m., Dr. Schmeyer met with Sarah Powell to discuss certain financial matters related to foreign currency.  During the meeting, Dr. Schmeyer sent a text message to Jacoby, but received no return message.  At 3:00 p.m., Dr. Schmeyer and Powell proceeded to the Hooters for the scheduled OSS meeting.  Jacoby never showed for this meeting, even though members of the club—including his fiancée— expected him to attend.  Powell tried unsuccessfully to call Jacoby.  Powell eventually left the restaurant to return to their shared home.  Jacoby was not there either.  Jacoby

finally returned home at approximately 6:00 p.m. He told Powell that he had been at work.

Around the same time that the OSS members were gathering, in a different part of town, William Kagarise exited his house on Snyder Mill Road, and walked toward his barn to feed his animals. As Kagarise walked to the barn, he looked up and saw a white male walking on Snyder Mill Road with his head down. The male was walking toward Trone Road, which is where Monica Schmeyer lived. Approximately twenty to thirty minutes later, Kagarise saw the same white male walking on Snyder Mill Road, but this time away from Trone Road. The man was carrying a white envelope in one hand, which Kagarise did not observe when he first saw the man.

Kagarise described the man as approximately five feet, ten inches tall, with short hair. Kagarise noted that the man was walking fast, and with a purpose, an unusual behavior for someone at that time of the day in that part of town. Kagarise had never seen the man before that day.

Anthony Crawford also lived on Snyder Mill Road. On the date in question, Crawford saw a silver van parked along Snyder Mill Road at approximately 4:30 or 5:00 p.m. He also saw a white male walking toward the van. Police later investigated the area and found two sets of tire tracks in the grassy area where Crawford saw the van. Using surveillance video from a local bank located minutes from Trone Road, the police were able to determine that the same van had passed the bank headed in the general direction of Monica Schmeyer's residence at about 2:38 p.m., and passed in the opposite direction at approximately 2:59 pm. The police observed the same van head again towards Trone Road at 3:56 p.m., and then return from that direction at 4:57 p.m.

The van belonged to a company called Armstrong World Industries. In 2010, both Stanley Knight and Jacoby worked for the company. Knight identified the van from

the surveillance videos. He explained that the van had been customized so that work-related materials could fit into it. Knight was able to observe some of the customizations to the van in the video, and positively identify the van. Knight also indicated that both he and Jacoby had used the van in the past, and that Jacoby had access to the van on the date in question.

When an employee at Armstrong World Industries used the van, he or she was required to sign out the van on a calendar that was posted in the lot where the van was parked. However, the March 2010 page was missing, which Knight found to be highly unusual. Nonetheless, Jacoby later submitted an expense report on March 31, 2010, which indicated that he used the van at some time between March 26 and March 31. Knight also noted that Armstrong World Industries did not do business in the area surrounding Monica Schmeyer's residence.

Dr. Samuel Land autopsied Monica Schmeyer, and concluded that she died from a single gunshot wound above her left ear. Dr. Land found a bullet and a fragment inside of Monica Schmeyer's skull. The doctor also observed bruising and lacerations to her brow, face, and chin. Dr. Land determined that these injuries were not consistent with a single post-death fall to the floor, but instead resulted from repeated strikes to the head by her assailant, possibly with a firearm.

When the police processed the crime scene, officers found blood on the bottom of Monica Schmeyer's sock and droplets of blood on her pants and bedding. The police believed that this blood evidence suggested that there was a struggle before she was killed. Thus, Dr. Land took scrapings from underneath Monica Schmeyer's fingernails and submitted them to the police for DNA testing.

The scrapings were submitted to NMS Labs for Y-STR DNA.[3]  A sample from Monica Schmeyer's left hand produced a full Y-STR profile from a single contributor. Further testing revealed that Jacoby and all of his male relatives could not be excluded as the source of the sample.  Notably, by all accounts, Monica Schmeyer had never met Jacoby before her death.  Thus, the presence of a Y-STR profile that could not exclude Jacoby under her fingernails provided police with compelling evidence that Jacoby was her murderer.

Corporal David Krumbine, an expert in firearm and tool mark examinations, inspected the .32 caliber Speer branded cartridge that was found near Monica Schmeyer's body.  Cpl. Krumbine determined that the cartridge could have been fired from a Kel-Tec manufactured firearm.  The expert also concluded that the bullet and fragment retrieved from Monica Schmeyer's skull were consistent with the Speer cartridge.

Cpl. Krumbine's conclusion that the cartridge could have been fired from a Kel-Tec firearm was important to the police's effort to identify the killer, because Jacoby was the registered owner of a Kel-Tec P32 semiautomatic handgun.  However, this particular weapon was never found, and no one could link the cartridge to the weapon registered to Jacoby.

The police were still investigating the murder approximately fifteen months later when they requested and obtained a search warrant for Jacoby's residence.  On July 6, 2011, the police executed the warrant and found a second-generation Kel-Tec barrel. The top of that barrel had been ground down to resemble the shape of a first-generation

---

[3]     As set forth in more detail *infra*, Y-STR DNA analysis is a form of DNA testing that focuses upon the Y-chromosome and can be used to exclude a male suspect and his male relatives from being a DNA match to a particular sample.

barrel, which is necessary for the second-generation barrel to fit onto a first-generation Kel-Tec firearm. Internet purchase records demonstrated that Jacoby had purchased a second-generation barrel, but this purchase occurred after Monica Schmeyer had been murdered. Nonetheless, as noted earlier, Jacoby was the registered owner of a first-generation Kel-Tec firearm, and the barrel that he purchased was not compatible with the weapon he owned without first being ground down to the correct size.

Following the search of Jacoby's residence, the police requested and received a second search warrant for Jacoby's parents' farm and home.[4] In part, the police sought the warrant because Jacoby's fiancée, Sara Powell, told police officers that Jacoby had moved his .32 caliber Kel-Tec weapon, which he usually kept under the pillow on his bed, to his parents' house. The warrant was executed later the next day.

At Jacoby's parents' house, the police found an empty box for a Kel-Tec P32 first-generation semiautomatic handgun, as well as documentation supporting the purchase and registration. Jacoby's signature was affixed to the documentation. The police also found live .32 caliber Speer ammunition, and a first-generation Kel-Tec barrel. The police also found a "Desert Eagle" .50 caliber handgun.[5]

The police also searched an area of Jacoby's parents' farm that was used as a shooting range. The police examined this area because Jacoby's brother had informed officers that he had seen Jacoby using the range to fire a .32 caliber weapon. There, the police found four .32 caliber Speer spent cartridge casings.

---

[4]     Jacoby challenges the affidavits of probable cause offered in support of both of these warrants in this direct appeal. We discuss the particulars of those affidavits in our analyses of Jacoby's challenges below.

[5]     This weapon formed the basis of a persons not to possess firearm charge against Jacoby. However, the Commonwealth later withdrew this charge.

Cpl. Krumbine examined the four casings, and compared them to the casing found next to Monica Schmeyer's body. He concluded that the casings all had been fired from the same, but unknown, firearm. He also ascertained that all of these cartridges contained the same Speer headstamp as the unspent ammunition found in Jacoby's parents' house.

Cpl. Krumbine then fired some test shots using the first-generation Kel-Tec barrel found at Jacoby's parents' residence. He noted that the bore of the barrel contained extensive scratch marks that were intentionally made, and not the result of normal cleaning. When fired, the weapon left marks on the bullets that were consistent with marks left on the bullet removed from Monica Schmeyer's skull, though Cpl. Krumbine could not conclude definitively that they were fired from the same gun because the damage to the bore rendered such an exacting analysis impossible.

On October 9, 2012, the Commonwealth filed an information formally charging Jacoby with the murder. On June 24, 2013, Jacoby filed a suppression motion seeking to suppress the evidence obtained as a result of the search warrants executed on his home and on his parents' home and property. Jacoby further challenged a separate search warrant used by the police to secure a DNA sample from him for comparison to the genetic material found under Monica Schmeyer's fingernails. Jacoby also requested a *Frye*[6] hearing, relative to the Commonwealth's Y-STR DNA analysis. Following a July 2, 2014 hearing, the trial court denied the motions.

On September 29, 2014, Jacoby proceeded to a jury trial. On October 8, 2014, the jury found Jacoby guilty of first-degree murder, burglary, tampering with physical evidence, and robbery. At the conclusion of the penalty phase, the jury recommended a

---

[6] *See Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).

death sentence. On October 9, 2014, the trial court formally sentenced Jacoby to death.

On October 20, 2014, Jacoby filed a timely post-sentence motion,[7] which the trial court denied on March 17, 2015. On July 23, 2015, Jacoby filed a petition seeking permission to file an appeal *nunc pro tunc* with the trial court, along with a contemporaneous *nunc pro tunc* notice of appeal. The trial court granted the permission on the same day.[8]

## II. Issues

Presently, Jacoby raises the following seven issues, which we have restated and reordered for ease of discussion and disposition:

I.   Whether the evidence presented, viewed in the light most favorable to the Commonwealth, was insufficient to prove beyond a reasonable doubt [Jacoby] guilty of first[-]degree murder, burglary[,] and robbery?

II.  Whether the trial court erred in denying [Jacoby's] request for a new trial where the first[-]degree murder, burglary[,] and robbery verdicts were contrary to the weight of the evidence and doshock one's sense of justice?

III. Whether the warrant seeking to search [Jacoby's] residence at 1719 West Princess Street, York[,] Pennsylvania[,] lacked probable cause[:]

1.   Whether there was insufficient information contained within the search warrant to establish probable cause that [Jacoby] was a suspect in the homicide?

2.   Whether the search warrant lack[ed] probable cause because it [did] not specifically set forth facts and circumstances to support the belief that the murder

---

[7]   The tenth day after sentencing fell on Sunday, October 19, 2014. Thus, Jacoby's motion, filed the next day, was timely. *See generally* 1 Pa.C.S. § 1908.

[8]   Both Jacoby and the trial court complied with Pa.R.A.P. 1925.

weapon [would have been] found in [Jacoby's] residence.

3. Whether the information in the affidavit of probable cause [was] stale.

IV. Whether the warrant seeking to search [Jacoby's] parents' residence at 2440 Meeting House Road, Spring Grove, Pennsylvania[,] lacked probable cause?

V. Whether the warrant to search [Jacoby] for a DNA sample lacked probable cause?

VI. Whether the trial court erred in denying [Jacoby's] request for a *Frye* hearing and admitted the Y[-]STR DNA evidence, where such evidence is unreliable?

VII. Whether the evidence presented during the penalty phase, viewed in the light most favorable to the Commonwealth, was insufficient to support a sentence of death?

Brief for Jacoby at 5-6 (some material omitted; capitalization modified).

## III. Sufficiency of Trial Evidence

Jacoby first challenges the sufficiency of the evidence proffered by the Commonwealth to prove him guilty of first-degree murder, burglary, and robbery. In reviewing sufficiency of evidence claims, "we determine 'whether the evidence admitted at trial, and all the reasonable inferences derived therefrom viewed in favor of the Commonwealth as verdict winner, supports the jury's findings of all the elements of the offense beyond a reasonable doubt.'" *Commonwealth v. Cash*, 137 A.3d 1262, 1269 (Pa. 2016) (quoting *Commonwealth v. Smith*, 985 A.2d 886, 894-95 (Pa. 2009)). A sufficiency challenge is a pure question of law. Thus, our standard of review is *de novo* and our scope of review is plenary. *Commonwealth v. Sanchez*, 82 A.3d 943, 967 (Pa. 2013).

We begin with Jacoby's challenge to his first-degree murder conviction. Jacoby argues that the Commonwealth failed to prove, beyond a reasonable doubt, that he killed Monica Schmeyer. Brief for Jacoby at 48. Essentially, Jacoby claims that neither

the Commonwealth's ballistics evidence nor its DNA evidence was sufficient to prove identity, either alone or when combined. Jacoby maintains that the remaining evidence consisted of nothing more than the creation of a timeline that was "so inconclusive that a jury could not draw a probability of fact from it." *Id.* at 51. The Commonwealth counters that various pieces of evidence permitted the jury to infer that Jacoby was the killer, even if the jury disregarded entirely its timeline evidence. *See generally* Brief for the Commonwealth at 66-67.

To sustain a conviction for first-degree murder, the Commonwealth must establish beyond a reasonable doubt that: (1) a human being was unlawfully killed; (2) the defendant was responsible for the killing; and (3) the defendant acted with malice and the specific intent to kill. *Sanchez*, 82 A.3d at 967 (citation omitted). As noted above, Jacoby challenges generally the Commonwealth's proof identifying him as the killer, and not whether the Commonwealth established the other elements of murder. Regardless of his specific argument, "[i]n all cases where a death sentence has been imposed, this Court is required to conduct an independent review of the sufficiency of the evidence supporting a first-degree murder conviction." *Commonwealth v. Perez*, 93 A.3d 829, 840 (Pa. 2014) (internal quotation marks and citation omitted). Thus, we will review briefly the evidence in support of the other elements of first-degree murder.

At trial, the Commonwealth called Dr. Land, who testified that Monica Schmeyer died from a gunshot wound to her head, with the point of entry being just above her left ear. Dr. Land also noted that she had bruises around both of her eyes, her right cheek, and left chin, as well as various skin tears around her mouth. In our view, this is sufficient evidence to show that the victim was killed unlawfully by someone with a specific intent to kill. *See Commonwealth v. Mattison*, 82 A.3d 386, 392 (Pa. 2013) (noting that "[s]pecific intent to kill can be established through circumstantial evidence,

such as the use of a deadly weapon on a vital part of the victim's body") (citing *Commonwealth v. Rega*, 933 A.2d 997, 1009 (Pa. 2007)).

We now focus upon Jacoby's specific identity challenge. The Commonwealth produced several witnesses at trial to establish Jacoby's identity as the murderer. Dr. Schmeyer testified that he met Jacoby and the other members of the OSS club at the local Hooters restaurant. Dr. Schmeyer also testified that he had been paying alimony to Monica Schmeyer in the amount of $1,700 per month in twenty-dollar bills. Dr. Schmeyer's younger daughter, Elsa, was living with Monica Schmeyer at the time. However, Elsa was in Japan on the actual date of the murder. Dr. Schmeyer explained at trial that he may have spoken about the alimony and Elsa's trip at the OSS meetings. Pete Lobianco, another member of the OSS, indicated at trial that he learned both of the alimony arrangement and Elsa's trip at OSS meetings, at which Jacoby usually was present. Both Dr. Schmeyer and Lobianco testified that Jacoby was not at the March 31, 2010 OSS meeting, which corresponded generally with the time that Monica Schmeyer was killed.

In addition, William Kagarise testified that he saw a white male matching Jacoby's description walking with his head down in the direction of Trone Road on the day of the murder. Kagarise saw the same person walking in the opposite direction twenty to thirty minutes later, carrying a white envelope that he did not have the first time that Kagarise saw him. Kagarise testified that he waved at the person and greeted him. The man only nodded, kept his head down, and passed by. Officer Jerry Knouse testified at trial that, when he was inside Monica Schmeyer's home after the murder, he observed several white envelopes containing various amounts of money.

Anthony Crawford testified that he observed a silver van pull onto the grass on Snyder Mill Road between 4:30 and 5:00 p.m. on the day in question, and saw a white

male walking in the direction of the van. Police located two sets of tire tracks on the grass in this location. Additionally, the bank's surveillance video showed a silver cargo van driving in the direction of Trone Road at about 2:38 p.m., and driving away at about 2:59 p.m. The same van appeared on the video at approximately 3:56 p.m. heading toward Trone Road, and heading away from that direction at 4:57 p.m. Stanley Knight, Jacoby's co-worker, identified the van in the surveillance video and explained that Jacoby had access to the van. When the police inspected the calendar that was used as a sign-out sheet for the van, they found that the March page had been removed from the calendar. No one could explain why that page was missing. However, Jacoby submitted an expense report for reimbursement for gas for the van during March 26 and March 31, 2010.

Cpl. Krumbine testified as an expert in firearms and tool mark examinations. He explained to the jury that the .32 caliber shell casing that was found at the murder scene was consistent with the unspent ammunition that was found in a bedroom in Jacoby's parents' home. Moreover, the casing was discharged from the same firearm that was used to fire the same size ammunition at the shooting range at Jacoby's parents' house. The search warrant executed on Jacoby's parents' house revealed an empty box for a .32 caliber Kel-Tec weapon and documentation proving that Jacoby purchased the weapon. These two items were found in the same bedroom where the unspent .32 caliber ammunition was found.

As noted earlier, the police obtained scrapings from underneath Monica Schmeyer's fingernails for DNA testing. Y-STR DNA testing revealed a DNA profile from under the nails that did not belong to Monica Schmeyer. Testing further determined that Jacoby, as well as all males in his paternal lineage, could not be excluded as the contributor of the sample.

As the ultimate finder of fact, the jury was free to believe some, all, or none of the Commonwealth's evidence. The jury also was free to resolve any inconsistencies or discrepancies in the testimony in either party's favor. *See generally Commonwealth v. Ramathal*, 33 A.3d 602, 607 (Pa. 2011) (explaining that "[t]he Commonwealth may sustain its burden of proof by means of wholly circumstantial evidence, and the jury, which passes upon the weight and credibility of each witness's testimony, is free to believe all, part, or none of the evidence"). Here, the evidence supported the jury's determination that Jacoby drove his employer's van to the area of the victim's residence, parked a distance away, walked to the residence, committed the murder, returned to the vehicle, and drove away. The testimony regarding the customized van belonging to Jacoby's employer, combined with the testimony concerning the shell casing, and Jacoby's knowledge that Monica Schmeyer would be alone and usually kept cash on hand was more than sufficient, when viewed in the light most favorable to the Commonwealth, to prove that Jacoby was the person who committed the murder. The evidence supports the first-degree murder conviction, and Jacoby is not entitled to relief on this claim.

Jacoby next claims that the Commonwealth presented insufficient evidence to sustain his burglary conviction. Specifically, Jacoby asserts that the Commonwealth failed to prove that it was Jacoby who had entered the residence and did so with intent to commit a crime therein. Brief for Jacoby at 52. To sustain a burglary conviction, "the Commonwealth is required to prove beyond a reasonable doubt that the offender entered the premises with the contemporaneous intent of committing a crime therein, at a time when he or she was not licensed or privileged to enter." *Sanchez*, 82 A.3d at 973.

Regarding his claim that the Commonwealth failed to prove that he was the actor, Jacoby incorporates by reference in his brief his identity argument in his challenge to his first-degree murder conviction. We reject the same argument for the reasons set forth in our preceding analysis.

Jacoby next contends that the Commonwealth did not prove that he entered the residence with the intent to commit a crime once inside. Jacoby relies upon two Superior Court opinions in support of this argument: *Commonwealth v. Willetts*, 419 A.2d 1280 (Pa. Super. 1980), and *Commonwealth v. Crowson*, 405 A.2d 1295 (Pa. Super. 1979) (*per curiam*). Neither case affords him any form of relief.

In *Willetts*, Willetts was convicted of attempted burglary and theft by unlawful taking. The theft conviction stemmed from Willetts being accused of stealing a van belonging to a business. The Commonwealth presented eyewitness testimony that Willetts was seen climbing in and out of, and kicking the van in question, that the van was stolen, and that a search of Willetts' person incident to his arrest yielded a map and a business card that was taken from the stolen van. Nevertheless, the Superior Court concluded that there was insufficient evidence of theft because "[t]here was no testimony placing [Willetts] in the vicinity of the service station from which the van was stolen, nor did anyone see [Willetts] operate the van . . . [and Willetts'] activity around the van did not evidence [] dominion and control over the vehicle." *Willetts*, 419 A.2d at 1282.

Likewise, in *Crowson,* the Superior Court reversed Crowson's burglary conviction. Specifically, the panel concluded that "there [was] no evidence that [Crowson] entered the [victim's] residence surreptitiously or by force. In fact, there is no evidence at all regarding the manner of entry by [Crowson] . . . [or] about the circumstances regarding [the] entry." *Crowson*, 405 A.2d at 1296. The Superior Court

rejected the Commonwealth's position that "specific intent to commit a crime can be inferred solely from the commission of a crime within the entered structure." *Id.* at 1296-97. Therefore, the intermediate court concluded that the Commonwealth had failed to provide sufficient evidence that Crowson's entry into the residence in question was done with the specific intent to commit a crime. *Id.* at 1297.

In this case, as noted above, the Commonwealth provided evidence that Jacoby was inside Monica Schmeyer's home, and was in possession of a .32 caliber firearm. The Commonwealth also established that Jacoby was seen by William Kagarise walking from the direction of the home with a white envelope in his hand. The police noted that Monica Schmeyer kept envelopes containing cash inside her home. The Commonwealth's evidence also established that Jacoby learned of this practice, and that Elsa Schmeyer would not be in the home on the day that he committed the murder. The evidence warranted the jury to infer that Jacoby, at a minimum, entered the home with the intent to commit at least a theft. Unlike *Willetts*, the Commonwealth produced evidence that placed Jacoby near the crime scene around the time of the 911 call. Furthermore, unlike *Crowson*, the Commonwealth introduced evidence that Jacoby and Monica Schmeyer did not know each other prior to the murder. From this information, the jury was free to conclude that Jacoby was not licensed or privileged to enter, and that he gained entry with the intent to commit a crime. Hence, the jury was provided with circumstantial evidence by which to evaluate the circumstances of the entry, a factor absent in *Crowson*. The evidence was sufficient to sustain the burglary conviction.

Next, Jacoby challenges his robbery conviction, contending that the Commonwealth's evidence was insufficient to prove that he committed a theft for purposes of the offense. *See* Brief for Jacoby at 54. To convict a person of robbery, as

is relevant to this case, the Commonwealth must prove that the person inflicted serious bodily injury upon another person in the course of committing a theft. 18 Pa.C.S. § 3701(a)(1)(i).

The Commonwealth demonstrated, through circumstantial evidence, that Jacoby was aware that Dr. Schmeyer paid alimony to Monica Schmeyer in cash, and that she would be home alone on the date in question. The evidence also established that Monica Schmeyer secreted her money in white envelopes that she placed around her house. Various witnesses established that Jacoby was seen going to and away from her residence on the date and at the time of the murder. More importantly, William Kagarise saw Jacoby coming from the residence carrying a white envelope identical to those in which Monica Schmeyer kept her money. Undoubtedly, the jury could infer from this evidence that Jacoby stole cash from Monica Schmeyer in the course of assaulting and killing her. Jacoby's argument to the contrary fails.

## IV. Weight of the Evidence

Next, Jacoby alleges that the verdict was against the weight of the evidence, asserting, *inter alia*, that the "physical evidence presented by the Commonwealth disputes the Commonwealth's own theory of the case." Brief for Jacoby at 57. Jacoby highlights minor inconsistencies between the surveillance video and the testimony of various Commonwealth witnesses. Jacoby notes that the Commonwealth's surveillance video shows the van driving to and from the direction of Trone Road within a span of only twenty-one minutes. He further points out that a detective at trial testified that it takes approximately four minutes to drive from the location of the surveillance video to Snyder Mill Road. A detective also approximated that it would take nine minutes to walk from Snyder Mill Road to Monica Schmeyer's residence. Thus, Jacoby contends, the Commonwealth's own witnesses established that it would have taken him at least

twenty-six minutes to complete the drive and walk to the residence, and back. This calculation does not even include any time spent inside the residence. Finally, Jacoby identifies other inconsistencies in the timeline testimony, such as the conflict between William Kagarise's statement that Jacoby walked back from the Trone Road area between 3:00 and 3:15 p.m. and Anthony Crawford's assertion that he saw Jacoby coming from that area at approximately 5:00 p.m., and with the surveillance video showing the van leaving that area at 2:50 p.m.

The Commonwealth counters Jacoby's argument, maintaining that the evidence pertaining to the location of the van and the eyewitness testimony was introduced for the purpose of establishing Jacoby's presence in the area of Monica Schmeyer's home at the time of the murder. Moreover, the "evidence shows that [Jacoby] had the opportunity to commit the home-invasion robbery that culminated in Monica Schmeyer's murder." Brief for the Commonwealth at 77. Although there were facial inconsistencies, the Commonwealth argues that the jury was free to use the evidence for these two purposes.

"A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court." *Commonwealth v. Clay*, 64 A.3d 1049, 1054-55 (Pa. 2013). "A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion." *Id.* at 1055. When a trial court considers a motion for a new trial based upon a weight of the evidence claim, the trial court may award relief only "when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." *Id.* The inquiry is not the same for an appellate court. Rather, when an appellate court reviews a weight claim, the court is reviewing the exercise of

discretion by the trial court, not the underlying question of whether the verdict was against the weight of the evidence. *Id.* at 1054. The appellate court reviews a weight claim using an abuse of discretion standard. *Id.* at 1057.

At trial, the jury was the ultimate fact-finder and the sole arbiter of the credibility of each of the witnesses. "Issues of witness credibility include questions of inconsistent testimony and improper motive." *Commonwealth v. Sanchez*, 36 A.3d 24, 27 (Pa. 2011) (citation omitted). A jury is entitled to resolve any inconsistences in the Commonwealth's evidence in the manner that it sees fit. *See Commonwealth v. Rivera*, 983 A.2d 1211, 1220 (Pa. 2009) (stating that "the trier of fact, in passing upon the credibility of witnesses, is free to believe all, part, or none of the evidence") (citation omitted).

As noted, inconsistencies in eyewitness testimony are not sufficient to warrant a new trial on grounds that the verdict was against the weight of the evidence. *Clay*, 64 A.3d at 1055. Although Jacoby has highlighted various inconsistencies in the Commonwealth's evidence, the jury was permitted to reject Anthony Crawford's testimony that Jacoby passed by at a much later time than other evidence suggested, and to resolve any minor inconsistencies between Kagarise's testimony and the surveillance video in the Commonwealth's favor. Assessing all of the evidence according to the governing principles cited above, we simply cannot conclude that the trial court abused its discretion when it concluded that the jury's verdict did not shock its sense of justice. Consequently, Jacoby's weight challenge necessarily fails.

## V. Search Warrant Executed on Jacoby's Residence

Jacoby raises several challenges to the search warrants issued in this case. In his first challenge in this regard, Jacoby challenges the warrant that was executed on his home on July 6, 2011. Jacoby presents three challenges to this warrant. First, he

asserts that the warrant lacked probable cause supporting the contention that he was the actor in the murder. Second, he maintains that the warrant lacked probable cause to establish that the murder weapon would be found inside his residence. Finally, Jacoby argues that the information contained in the affidavit of probable cause was stale. We find merit to some of Jacoby's arguments, but hold that any error was harmless.

We review the denial of a motion to suppress by examining whether the trial court's factual findings are supported by the record. In doing so, we consider all of the Commonwealth's evidence, as the succeeding party, as well as any defense evidence that went uncontradicted. *Commonwealth v. Martin*, 101 A.3d 706, 719 (Pa. 2014) (citation omitted). We are bound by any factual findings that are supported by the record. *Id.* However, we owe no deference to any legal conclusions drawn by the trial court. To the contrary, we review those conclusions *de novo*. *Commonwealth v. Briggs*, 12 A.3d 291, 320-21 (Pa. 2011).

All three of Jacoby's contentions pertain to the alleged inadequacy (and staleness) of probable cause offered in support of the warrant. The Fourth Amendment to the United States Constitution commands that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend IV. Similarly, Article I, Section 8 of the Pennsylvania Constitution provides that "[t]he people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall

issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant." PA. CONST. art. I, § 8.

A search warrant may issue only upon a demonstration of probable cause by an affiant. *See generally Commonwealth v. Gary*, 91 A.3d 102, 107 (Pa. 2014). The existence of probable cause is measured by examining the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "Probable cause exists where the facts and circumstances within the affiant's knowledge and of which he [or she] has reasonably trustworthy information are sufficient in and of themselves to warrant a [person] of reasonable caution in the belief that a search should be conducted." *Commonwealth v. Johnson*, 42 A.3d 1017, 1031 (Pa. 2012) (internal quotation marks and citation omitted). A magisterial district judge, when deciding whether to issue a search warrant, must "make a practical, common-sense decision whether, given all of the circumstances set forth in the affidavit . . . including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* (citation omitted). Conversely, "[a] court reviewing a search warrant determines only if a substantial basis existed for the magistrate to find probable cause." *Id.* (citation omitted). We also note that there is a strict particularity requirement in Article I, Section 8 of the Pennsylvania Constitution that "a warrant must describe the items as specifically as is reasonably possible." *Commonwealth v. Grossman*, 555 A.2d 896, 899 (Pa. 1989); *see also* Pa.R.Crim.P. 205(2) (requiring all search warrants to "identify specifically the property to be seized"); *id.* at 205(3) (requiring all search warrants to "name or describe with particularity the person or place to be searched").

The murder in this case occurred on March 31, 2010. The warrant to search Jacoby's house did not issue until approximately fifteen months later, on July 6, 2011.

Detective Lisa Layden applied for the warrant, and was the affiant on the affidavit of probable cause. The affidavit contained the following information.

Det. Layden noted that a .32 caliber shell casing was found at the scene of the murder. She further indicated that the casing most likely came from a .32 caliber firearm, possibly one manufactured by Kel-Tec. Search Warrant S51, Affidavit of Probable Cause, 7/6/2011, at 7. The detective explained that Jacoby was the registered owner of a Kel-Tec .32 caliber semiautomatic pistol. *Id.*

Det. Layden also averred that Officer Bryn Lindenmuth interviewed Monica Schmeyer's neighbors in the days following the murder. One witness, William Kagarise, provided Officer Lindenmuth with a description of a man that he saw walking toward, and later away from, Monica Schmeyer's home around the time of the killing. *Id.* at 3. Det. Layden noted that Anthony Crawford provided Officer Lindenmuth with a similar physical description of a man that he observed on the same day. *Id.* Crawford also told Officer Lindenmuth that he saw a silver van parked in the grass on the side of the road near his home. *Id.*

Det. Layden interviewed a woman named Olivia Becker. Becker was Dr. Schmeyer's girlfriend. She described a man who was a member of the OSS with Dr. Schmeyer. *Id.* at 6. The detective noted that the description was similar to those provided by Kagarise and Crawford. *Id.* Moreover, the descriptions matched Jacoby. *Id.* at 7.

Det. Layden then explained that she interviewed Bob Sandkuhler and James Baker of Armstrong World Industries. Both men confirmed that Jacoby worked for that company. *Id.* They both informed Det. Layden that Jacoby had signed the company's silver van out for use on the day of the murder. The detective explained in the affidavit that the van owned by Armstrong World Industries was consistent with the description of

the silver van provided by Anthony Crawford. Det. Layden met again with Crawford, who identified the van owned by Armstrong World Industries as the van he saw near his house on the day of the murder. *Id.*

Finally, Det. Layden's affidavit described Jacoby's firearm as follows:

The weapon referred to in this search warrant application is a unique item. The current registered owner (Jacoby) is a convicted felon according to a criminal history check through PA State Police. Due to this past history, it is reasonable to believe Jacoby would retain this item, as he is barred from legally obtaining another hand-gun.

It is reasonable to believe that evidence relevant and material to this criminal investigation may be found within the residence, property and/or vehicles owned, rented, or accessible to Jacoby or Sara Powell.

*Id.* at 8.

We are mindful that, "[i]n dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States*, 338 U.S. 160, 175 (1949). Thus, viewing the information contained in Det. Layden's affidavit accordingly, we reject Jacoby's arguments that the affidavit lacked probable cause to believe that he was the actor in the murder. The affidavit, on its face, provided sufficient probable cause to indicate that Jacoby was the man seen walking to and from the direction of Monica Schmeyer's residence on the day in question, and that he used a van belonging to his employer to drive to and from the general area. There also was probable cause to believe that Jacoby owned a .32 caliber weapon, the same type of weapon used in the murder. Thus, the statement of probable cause was sufficient in this regard. However, his arguments pertaining to whether probable cause existed to believe that the weapon would be found in his home and that the information contained in the affidavit on this

point was stale are not as easily rejected. To the contrary, we find merit to those claims.

As noted, Jacoby challenges both the adequacy and staleness of the information offered in the affidavit to believe that the alleged murder weapon would be found in his home fifteen months after the murder. Again, Det. Layden asserted in the affidavit that it was "reasonable" to believe the murder weapon was secreted in Jacoby's house after such a substantial period of time because Jacoby was not permitted to own a weapon as a felon, and therefore was likely to retain the weapon due to the difficulty in procuring another one in light of his felon status. This is conjecture and speculation, particularly considering the gap in time, and cannot suffice as probable cause on this point.

The trial court reached similarly speculative conclusions. The court held that the information provided probable cause and was not stale for two reasons. First, the court noted that "guns are durable and sometimes valuable objects that people typically hold on to for the long term." Trial Court Opinion, 9/21/2015, at 4. This conclusion suffers from the same defect as Det. Layden's. It is not tailored or individualized to Jacoby in any fashion. The court reaches its conclusions on what some unknown people may or may not do under undefined circumstances. This conclusion falls short of probable cause. Second, like Det. Layden, the court held that "the fact that [Jacoby] is a convicted felon and therefore unable to legally obtain another firearm, increases the likelihood that he would have held on to the firearm already in his possession." *Id.* Even if the trial court is correct that Jacoby's felony status "increases the likelihood" of keeping the firearm, that is not the same as establishing that it is probable that the firearm was still in Jacoby's home. Like the court's first conclusion, the latter explanation is not individualized to Jacoby, or his circumstances. The trial court's conclusion rests upon the same flaw described earlier. Probable cause, at a minimum,

must be individualized to the suspect and the circumstances of the case; it requires more than generalized statements about human behavior that are unsupported by the specific facts of the case.

"At the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Kyllo v. United States*, 533 U.S. 27, 31 (2001) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961) (internal quotation marks omitted)). Generally, before police officers constitutionally, *i.e.*, reasonably, may enter into a person's home to search for evidence of a particular crime, they must apply for, and obtain from a neutral and detached magistrate, a search warrant supported by individualized probable cause.

Neither the Fourth Amendment nor Article I, Section 8 of the Pennsylvania Constitution explicitly requires individualized suspicion. *See Samson v. California*, 547 U.S. 843, 855 n.4 (2006) ("The touchstone of the Fourth Amendment is reasonableness, not individualized suspicion."). Nonetheless, although not an "irreducible" component of reasonableness, the general rule is that probable cause must be predicated upon individualized suspicion, and that searches conducted without such suspicion ordinarily are deemed unreasonable. *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000) (citing *Chandler v. Miller*, 520 U.S. 305, 308 (1997)); *Commonwealth v. Mistler*, 912 A.2d 1265, 1271 (Pa. 2006). The United States Supreme Court has deviated from this baseline principle only in very limited circumstances, such as when intrusion would serve "special needs, beyond the normal need for law enforcement." *Edmond*, 531 U.S. at 37 (citations omitted). Examples of such instances include: (1) drug tests; (2) certain administrative purposes; (3) border patrol checkpoints; and (4) sobriety checkpoints. *See Mistler*, 912 A.2d at 1271 (collecting cases). The search warrant executed in the case *sub judice* implicated none of these special categories. As

such, the probable cause offered in support of that warrant was subject to the general rule, and, thus, must have manifested suspicion individualized to the time and place of the search. It failed to do so here.

Probable cause to search Jacoby's home did not exist simply because probable cause existed to believe that he had committed the murder, with a weapon of the same caliber as one that he owned, and then drove in the general direction of his home fifteen months before the search warrant was issued. Together and by themselves, these factors do not justify entry without some nexus to the home. The trial court overlooked the significant gap of time between the murder and the search, and then attempted to buttress its conclusion with an unsourced assessment of general human behavior. Without support, the trial court reasoned that people—felons especially—generally do not discard firearms, even those used in murders.

This broad perspective on probable cause finds no support in Pennsylvania law and is troubling on several levels. First, the trial court deviated from the search jurisprudence summarized above without acknowledging or attempting to distinguish it. The trial court would hold that, if police officers develop probable cause that a person committed an offense anywhere in the Commonwealth with a weapon of the same caliber as the one that he or she owns, probable cause exists automatically to search that person's home, no matter where it is located. It is easy to discern the infirmity of this approach. If the trial court's reasoning were to prevail, when a person commits an offense with such a weapon in Erie County, police automatically would have probable cause to search that person's home, even if it is located in Delaware County. This is inconsistent with Fourth Amendment jurisprudence.

Additionally, the trial court's method for evaluating probable cause does not require consideration, in any way, of the time lapse between the commission of the

offense and the search. Rather than addressing the time gap, the trial court would rest upon its belief that people generally hold on to guns (even those used in murders) and that, as such, probable cause to search for guns exists in apparent perpetuity. By this logic, in the case of the Erie murder, the trial court would find probable cause to search the Delaware County residence not only immediately after the murder, but also fifteen months later, and presumably even ten years after the crime.

Finally, aside from the deviation from the core principles of the Fourth Amendment and Article I, Section 8 that necessarily results from evaluating probable cause in such general, categorical terms, there is another obvious peril in considering probable cause in this manner. People of different genders, races, religions, and backgrounds might respond to certain circumstances differently. Similarly, older people might not conduct themselves as a younger generation would. Mainers might not behave like Texans. There is nothing even to suggest that similar people within the same general category would respond to a set of circumstances in the same way. Probable cause to search Jacoby's home must be evaluated based upon the circumstances of his case, his behavior, and any nexus to the location to be searched, but not upon categorical assumptions. Our Constitutions prohibit such categorical conclusions, as well as those searches that are based upon such conclusions.

The architects of our Constitutions rejected general searches, and instead charged police officers with demonstrating specific and articulable facts to establish probable cause that a particular person committed a particular crime and that evidence of that crime would be found in a particular place. The trial court's approach shortcuts this bedrock inquiry with general assumptions about human behavior, untethered to the actual facts at hand, and was erroneous. For these reasons, we find an absence of probable cause in the warrant to believe that the murder weapon would be found in

Jacoby's residence fifteen months after the murder. As such, we need not address Jacoby's staleness argument.

However, Jacoby is not entitled to relief, because we find that that the trial court's error was harmless. "An error is harmless if it could not have contributed to the verdict. In other words, an error cannot be harmless if there is a reasonable possibility the error might have contributed to the conviction." *Commonwealth v. Wright*, 961 A.2d 119, 143 (Pa. 2008) (citation omitted). The Commonwealth bears the burden to prove beyond a reasonable doubt that the error did not contribute to the verdict. *Id.* (citation omitted). In our view, it has done so here.

> Harmless error exists where: (1) the error did not prejudice the defendant or the prejudice was *de minimis*; (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Commonwealth v. Chmiel*, 889 A.2d 501, 521 (Pa. 2005) (quoting *Commonwealth v. Robinson*, 721 A.2d 344, 350 (Pa. 1998)).

Earlier in this opinion, we summarized all of the evidence presented against Jacoby. Reviewing that evidence in light of the standard set forth immediately above, we conclude that the Commonwealth's evidence, sans the Kel-Tec second-generation barrel that was found in Jacoby's home, was overwhelming, and that the introduction of the barrel was "so insignificant by comparison that the error could not have contributed to the verdict." *Id.* The Commonwealth's evidence established that Monica Schmeyer was killed by a gunshot wound to the head, which was inflicted from a close distance. Discussions at OSS meetings revealed that Monica Schmeyer collected support from Dr. Schmeyer, and that she kept the funds in cash and in white envelopes. Moreover, Dr. Schmeyer announced at those same meetings that Schmeyers' daughter would not

be home on the day of the murder.  On that date, a man matching Jacoby's description was seen driving a customized van that belonged to the company for which Jacoby worked.  Jacoby later submitted a voucher for reimbursement for costs associated with the use of the van for a span of time that included the day of the murder.  The man meeting Jacoby's description also was seen walking in the direction of the Schmeyer residence, and then walking back a short time later carrying a white envelope.  Jacoby, who attended OSS meetings,[9] also was not present at the OSS meeting that was held at the exact time that Monica Schmeyer was murdered, even though his fiancée generally expected him to be at the meeting.

The murder weapon was a .32 caliber firearm.  The police recovered ammunition matching the casings found at the murder scene at the following locations:  a bedroom in Jacoby's parents' home, and a makeshift shooting-range on that property.  In fact, the casings found at the murder scene were proven definitively to have been fired from a gun that also was fired at that shooting range.  The Commonwealth produced for the jury a receipt proving that Jacoby had purchased a .32 caliber firearm.

Finally, through the Y-STR DNA testimony, the Commonwealth was able to include Jacoby, by virtue of his male lineage, in the limited group of people who could

---

[9]     As the dissent observes, the frequency of Jacoby's attendance at the OSS meetings was not described with precision at trial.  *Compare* N.T., Oct. 6, 2014, at 1212 (indicating that Jacoby's attendance was irregular), *with id.* at 1297 (characterizing the attendance as "somewhat regular.").  Nonetheless, the point is that the crime aligned with the circumstances discussed at the OSS meeting, such as the fact that Monica Schmeyer secreted her money in white envelopes and the fact that she was alone on the date of the murder due to her daughter's absence.  The remainder of the evidence convincingly established that Jacoby was the perpetrator of the crime.  Thus, explicit testimony proving that Jacoby attended the meeting where these matters were discussed was not necessary.  The circumstantial evidence proved both the crime and the identity of the perpetrator.

have committed the crime, as such biological evidence was found under Monica Schmeyer's fingernails.

Viewed objectively, this evidence demonstrates overwhelmingly that Jacoby was the murderer, even without considering the evidence found via the search warrant executed on Jacoby's residence. In dissent, Chief Justice Saylor maintains that introduction of the Kel-Tech second-generation barrel could not have been harmless, largely because, in closing arguments, the Commonwealth urged the jury to consider that evidence. *See* Dissenting Opinion at 5-6 (citing N.T. 10/7/2014 at 1535 ("The ballistics tell us everything."); *id.* at 1564 ("Gun, DNA, guilty.")). However, the barrel found in Jacoby's home was not the entirety of the ballistics evidence, and not the only evidence relied upon by the Commonwealth. The ballistics evidence included the much more inculpatory material that was found at Jacoby's parents' house, which police actually matched with the evidence found at the murder scene. Hence, there was ample, indeed overwhelming, ballistics evidence even without the barrel in question.

Moreover, although the Commonwealth's arguments fairly can shed light on the importance of certain aspects of its evidentiary case, those arguments do not automatically shield errors from being deemed harmless, and do not do so here. As the preceding summary of the inculpatory evidence demonstrates, the Kel-Tech barrel played, at best, only a minimal part in the Commonwealth's ballistics evidence and its overall evidentiary presentation, and its admission was overwhelmed by the substantial remainder of inculpatory evidence. Thus, we hold that the incorrectly admitted evidence did not contribute to the verdict in any meaningful way. The error, simply put, was harmless. Jacoby is not entitled to relief.

### VI. Search Warrant Executed on Jacoby's Parents' Residence

Jacoby next challenges the July 7, 2011 search warrant that was executed on his parents' home. Specifically, Jacoby contends that the affidavit lacked sufficient probable cause to justify issuance of the warrant. In his view, the affidavit lacked specific facts that would lead one to conclude that evidence of the homicide might be found in his parents' home, and, to the extent that such information was in the affidavit, it was stale. Brief for Jacoby at 32-33. The Commonwealth has two responses. First, as a threshold matter, the Commonwealth disputes the trial court's conclusion that Jacoby had standing to contest the search of his parents' home. Second, the Commonwealth claims that the affidavit contained adequate probable cause to support the issuance of the warrant, and the facts offered in support of probable cause were not stale. Brief for the Commonwealth at 31, 33-34.

The affidavit offered in support of the warrant to search Jacoby's parents' home contained all of the same information that was averred in the affidavit to search Jacoby's house, but with the following averments, as summarized by the trial court:

> During the search of [Jacoby's] residence, a small caliber bullet and barrel of a handgun had been found; and

> [Jacoby's] fiancée, who lived with [Jacoby] at his residence, had seen handguns in their home, including a small gun fitting the description of the weapon used to murder the Victim, and had also seen [Jacoby] give guns to his father and shoot guns at the range on his father's farmette on 2440 Meeting House Road.

Trial Court Opinion, 9/21/2015, at 6; Search Warrant S57, Affidavit of Probable Cause, 7/6/2011, at 8.

Before we can assess whether these additional statements suffice to establish probable cause to search Jacoby's parents' residence, we first must consider whether Jacoby has standing to challenge the search. Standing is the authority "to assert a constitutional violation and thus seek to exclude or suppress the government's evidence

pursuant to the exclusionary rules under the Fourth Amendment [to] the United States Constitution or Article 1, Section 8 of the Pennsylvania Constitution." *Commonwealth v. Hawkins*, 718 A.2d 265, 266 (Pa. 1998) (citation omitted). In Pennsylvania, as a constitutional mandate, individuals that are charged with possessory offenses generally enjoy automatic standing to challenge the constitutionality of searches that yield evidence that the Commonwealth intends to use against that person at trial. *See Commonwealth v. Sell*, 470 A.2d 457, 469 (Pa. 1983). However, that mandate does not extend to any and all possessory offenses. Indeed, there are limits to automatic standing.

Generally, a defendant will have automatic standing to challenge a search or seizure if he or she can demonstrate either: "(1) his presence on the premises at the time of the search and seizure; (2) a possessory interest in the evidence [unconstitutionally] seized; (3) that the offense charged include[s] as an essential element of the prosecution's case, the element of possession at the time of the contested search and seizure; or (4) a propriety or possessory interest in the searched premises." *Commonwealth v. Peterkin*, 513 A.2d 373, 378 (Pa. 1986) (citation omitted; brackets in original).

In this case, Jacoby maintained that he had automatic standing under Article I, Section 8, of the Pennsylvania Constitution, because he had been charged with at least one possessory offense. The Commonwealth responded that this Court's decision in *Peterkin*—discussed immediately below—limits the application of the automatic standing doctrine when the basis for standing is a possessory offense. The trial court determined that Jacoby had standing because he had been charged with persons not to possess a firearm in connection with the .50 caliber Desert Eagle handgun that was found in his parents' home. The trial court apparently believed that the existence of the

possessory charge sufficed to establish standing, without any further consideration of the timing and circumstances of that offense. *Peterkin* instructs otherwise.

In *Peterkin*, following convictions for first-degree murder, robbery, and possession of an instrument of crime ("PIC"), Peterkin challenged the search of a friend's home, where the police found the murder weapon that that also formed the basis of the PIC charge. Among other claims, Peterkin alleged that he had automatic standing to challenge the search of his friend's home. *Id.* at 377. This Court specifically rejected the notion that the PIC charge, in and of itself, conferred automatic standing upon Peterkin. We explained that the Commonwealth's "case against [Peterkin] on that charge was not dependent upon his possession of the instrument of the crime at the time of the contested search and seizure." *Id.* at 378. Rather, the PIC "charge emanated from [Peterkin's] criminal employment of the [weapon] in the commission of the murders and robbery." *Id.*

In the case *sub judice*, it is undisputed that Jacoby was not present at the time of the search of his parents' home, that he lacked a possessory interest in his parents' home, and that he lacked a possessory interest in the items seized. Furthermore, although the Commonwealth initially charged Jacoby with persons not to possess a firearm, the trial court erred in relying upon this charge to award automatic standing. According to the criminal information, the Commonwealth alleged "that on or about March 31, 2010," Jacoby "possessed . . . a .50 caliber pistol" at a time when Jacoby had previously been convicted of a robbery, a felony for purposes of a persons not to posses a firearm charge. Criminal Information, 10/9/2012, at 1. The possessory offense, in and of itself, however, is not dispositive. *Peterkin* requires us to focus upon whether the defendant is charged with possessing a certain item or contraband "at the time of the contested search and seizure." *Peterkin*, 513 A.2d at 378. Here, the

"contested search and seizure" is the July 7, 2011 search of Jacoby's parents' home, whereas the Commonwealth alleged that the crime of persons not to possess occurred when the murder took place, on March 31, 2010. Criminal Information, 10/9/2012, at 1. Thus, as in *Peterkin*, because the Commonwealth did not charge Jacoby with a possessory offense arising from the time of the contested search, the possessory offense itself does not confer automatic standing upon Jacoby. Consequently, Jacoby lacked standing to challenge the search warrant and subsequent search of his parents' home.[10]

## VII. Search Warrant for DNA Sample

In his next argument, Jacoby challenges the search warrant issued to collect a DNA sample from him. Specifically, Jacoby maintains that the warrant was not supported by probable cause, because the informant used, in part, as the basis for probable cause was anonymous. Jacoby also argues that, even though the informant indicated that Jacoby had a cut on his hand on the day of the murder, the informant did not specify where the cut was located on his hand or the seriousness of the cut. Apparently, Jacoby believes that this lack of specificity undercuts the existence of probable cause. The Commonwealth argues that Jacoby's argument zeroes in on only

---

[10] As a side note, even if Jacoby did have automatic standing, he nonetheless likely would be unable to satisfy another threshold requirement for suppression, that he demonstrate an expectation of privacy in the area that was searched. Standing confers only the authority to file the motion and assert a constitutional violation. *See generally Commonwealth v. Enimpah*, 106 A.3d 695, at 698-99 (Pa. 2014). But, it does not negate the need to demonstrate a reasonable expectation of privacy in the area that was searched. *See New York v. Class*, 475 U.S. 106, 112 (1986) (explaining that a "State's intrusion into a particular area, whether in an automobile or elsewhere, cannot result in a Fourth Amendment violation unless the area is one in which there is a constitutionally protected reasonable expectation of privacy") (internal quotation marks omitted). Here, Jacoby would have had to prove that he had an expectation of privacy in someone else's house.

one line of the affidavit of probable cause, and ignores the remainder of the information contained therein. In the Commonwealth's view, "[l]ooking at the information contained in the affidavit as a whole in a common sense, non-technical manner, the affidavit contains sufficient information to establish probable cause." Brief for the Commonwealth at 35.

The affidavit for the DNA warrant details the evidence that the police had gathered and asserted in the search warrant application for Jacoby's residence. Particularly, the affidavit notes the description of the van and the witnesses who saw a man matching Jacoby's general features walking to and from the direction of Trone Road on the date and at the time of the murder. Search Warrant S65, Affidavit of Probable Cause, 9/20/2012, at 2. In addition, the affidavit contains information related to the evidence found through the execution of the warrants on Jacoby's residence and on Jacoby's parents' residence, including the weapon and ammunition evidence. *Id.* at 3. The affidavit also notes that ballistic testing confirmed that "all of the .32 caliber spent shell casings recovered at [Jacoby's] parents' property were fired from the same gun that fired the .32 caliber spent shell casing found at the crime scene." *Id.* at 4. Finally, the affidavit indicates that Monica Schmeyer had multiple contusions on her body that were indicative of an assault, and that fingernail scrapings from both of her hands, which may be suitable for locating and testing a DNA sample from her attacker, had been preserved during the autopsy. *Id.* at 4-5.

The totality of the circumstances described within the four corners of the affidavit established probable cause for the issuance of the warrant. The affidavit described the evidence gathered by law enforcement throughout the investigation, including two executed search warrants, which convincingly raised the probability that Jacoby was the perpetrator of the murder. This, coupled with the description of the nature and

character of the injuries sustained by Monica Schmeyer during the assault, created the probability that Jacoby's DNA would be found on the fingernail scrapings preserved during the autopsy. It is immaterial to our analysis whether anyone observed a cut on Jacoby's hand. Probable cause clearly existed regardless of that information. The trial court correctly denied Jacoby's suppression motion pertaining to the DNA warrant.

### VIII. *Frye* Hearing on Y-STR DNA Evidence

Next, Jacoby asserts that the trial court erred in denying his request for a *Frye* hearing on the reliability of the methodology used in the Y-STR DNA testing. Brief for Jacoby at 38-47. Appellate courts review evidentiary decisions for an abuse of discretion. *Commonwealth v. Walker*, 92 A.3d 766, 772 (Pa. 2014) (citations omitted). "An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused." *Id.* at 772-73 (internal quotation marks and citations omitted).

In general, expert testimony is permitted in all trials "when it involves explanations and inferences not within the range of ordinary training[,] knowledge, intelligence and experience." *Id.* at 788. Expert testimony is governed generally by Rule 702 of the Pennsylvania Rules of Evidence.

**Rule 702. Testimony by Expert Witnesses.**

A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;

> (b) the expert's scientific, technical, or otherwise specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and

(c) the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 702. The *Frye* standard, first adopted by this Court in *Commonwealth v. Topa*, 369 A.2d 1277 (Pa. 1977), is used to determine the admissibility of novel scientific evidence, and is incorporated into Rule 702. *Grady v. Frito-Lay Inc.*, 839 A.2d 1038, 1043 (Pa. 2003). *Frye* permits novel scientific evidence to be admitted at trial "if the methodology that underlies the evidence has general acceptance in the relevant scientific community." *Walker*, 92 A.3d at 789 (citation omitted). Once it is established that the scientific evidence in question is novel, "the proponent must show that the methodology is generally accepted by scientists in the relevant field, but need not prove the conclusions are generally accepted." *Id.* at 790 (citation omitted). The burden is on the proponent of the evidence to demonstrate its admissibility. *Id.* A *Frye* hearing is not required in every instance that a party wants to introduce scientific evidence. Rather, a hearing is warranted only when the trial court "has articulable grounds to believe that an expert witness has not applied accepted scientific methodology in a conventional fashion in reaching his or her conclusions." *Id.* (citation omitted).

As noted above, the science at issue in this case is Y-STR DNA. Pennsylvania courts have not had an opportunity to comment upon the admissibility of Y-STR DNA evidence. We begin with a description of Y-STR DNA, upon which the parties appear to agree. As Jacoby points out, in general, "[t]here are basically two types of DNA testing: RFLP (restriction fragment length polymorphisms) and PCR (polymerase chain reaction)."[11] Brief for Jacoby at 38. In PCR testing, a technician takes DNA primers and consistently copies these two pieces of DNA over a period of time to the point that

_____

[11] Jacoby acknowledges that this Court has upheld the RFLP method as generally accepted in the scientific community. *See generally Commonwealth v. Blasioli*, 713 A.2d 1117, 1126-27 (Pa. 1998).

"millions or billions of DNA molecules" are created. *Id.* at 39. STR stands for "short tandem repeats," which basically is a short DNA sequence that repeats itself.[12] *Id.* "The number of repeats in STR markers can be highly variable among individuals, which make them particularly desirable for identification determinations." *People v. Zapata*, 8 N.E. 3d 1188, 1192 (Ill. App. Ct. 2014) (citation omitted). Current STR analyses "focus[] on the small noncoding regions of the DNA molecule." *Id.* (citation omitted). "The number of repeats of a specific STR sequence present at a given locus, combined over a designated number of loci, creates a unique DNA 'profile' of an individual." *Id.* (citation omitted).

Y-STR DNA focuses upon the Y chromosome, which is "found only in males and is one of the smallest human chromosomes." Brief for Jacoby at 40 (citation omitted). When conducting a Y-STR DNA analysis, the scientist is looking at how common this particular locus or haplotype is in the database of Y chromosomes. *Id.*

In his pretrial motion, Jacoby requested a *Frye* hearing for two general reasons. First, Jacoby maintained that "Y-STR is notably weaker [than other types of DNA testing] because instead of making a 'match,' the result can merely indicate that Jacoby and all his male relatives cannot be ruled out." Jacoby's Omnibus Pretrial Motion, 6/24/2013, at ¶55; *see id.* at ¶59 (stating, "Y-STR DNA cannot uniquely identify an individual like RFLP DNA, and should be reserved for cases where STR testing has failed"). Second, Jacoby claimed that the Y-STR DNA database has problems like "size limitations, a limited cross-section of samples and a limited representation of rare

---

[12]     As this Court noted in *Blasioli*, "[t]here are four kinds of nucleotide bases in DNA: adenine (A), guanine (G), cytosine (C), and thymine (T). Due to their chemical composition, these can fit together only as follows: adenine will only pair with thymine, and cytosine will pair only with guanine." *Blasioli*, 713 A.2d at 1120 n.5 (citation omitted).

haplotypes." *Id.* at ¶60. Presently, Jacoby claims that "unlike autosomal DNA, Y-STR DNA has limited discriminatory power." Brief for Jacoby at 42. Jacoby also argues that "[t]here are several limitations to the current databases available for Y-STR DNA comparison." *Id.* at 45. Although Jacoby asserts that NMS Labs uses the "counting method,"[13] he does not argue that the counting method is novel science, nor does he challenge the statistical conclusions stemming from the use of the counting method. *See id.* at 40-41.

As noted, Jacoby has raised a number of arguments in support of his request for a *Frye* hearing. However, at the trial court's hearing on the motion, it is clear that Jacoby was unable to satisfy the threshold *Frye* requirement that the methodology being challenged is novel. To appreciate fully the deficiency in this aspect of Jacoby's argument, a review of the relevant portions of the transcript from that hearing is necessary, and follows:

> [ADA]: . . . the Commonwealth would assert that there is not the need for a *Frye* hearing in this matter because this is not novel science.
>
> \* \* \*
>
> THE COURT: But wait a minute, we're talking about whether from a perspective of -- is it novel science, or is it just a different application of established science? Is that not really what this is about?
>
> [DEFENSE COUNSEL]: It is, yes. However, when you're looking at how you analyze Y-STR, its application is

_____

[13] Jacoby describes the counting method as being comprised of four steps. First, a "profile of a Y[-]STR haplotype generated from an evidence sample is searched against a reference database(s) of unrelated individuals[.]" Brief for Jacoby at 40. Next, "[t]he number of times the Y[-]STR haplotype is observed in a database is counted[.]" *Id.* The third step is where "[t]hat count is divided by the number of profiles in the reference database(s)[.]" *Id.* Finally, "[a] confidence interval is placed on the proportion of count/total profiles in a database(s)." *Id.* at 41.

relevant, because you can't just take the data, you have to analyze the data. So when you're analyzing the data and using it in the capacity of forensic science, and using it in a criminal case, specifically a homicide, that's why we consider the application, the analysis to be novel.

THE COURT: And I don't get that. Why is that?

[DEFENSE COUNSEL]: Because I don't think you can look at it as just a bright line test, considering how we use the analysis of it. You have to take the DNA, and once you gather the DNA, then you have to put it and analyze it against everything else.

THE COURT: Is there anything novel about any of that so far?

[DEFENSE COUNSEL]: Novel? Not until you get to the second part, no. The analysis, the gathering, that is not novel science.

THE COURT: What is novel then?

[DEFENSE COUNSEL]: Then when you get to the databases and the analysis portion of it. With regular STR, you can put it in the database and it comes back and says that the DNA that we found belongs to Your Honor, and the chance of it being anyone else would be more than the people on the planet.

When you're looking at Y-STR, it doesn't do that, and I understand that that doesn't make it novel, but you have to get the database. The database for STR is ginormous, more than the people on the planet. For Y-STR, we're not at that point yet, and that's why I say its application is novel in this area.

THE COURT: Is there anything novel about how the database is gathered or how the data making up that base is gathered?

[DEFENSE COUNSEL]: It is to some extent because we're not in the same place. Like a regular database for STR, I can take someone's DNA and I can put it in the

national database, and I know that that's out there and it's used. You can't do that with Y-STR. It has to be kept separate from everyone else. You can't mix the two together because they're different, so we're starting at something new.

THE COURT: How is that new? How is that new? That sounds like they are gathering -- the scientific methods used to gather the data to form the basis of it is hindsight. That's my understanding. I'm not a scientist. I could be wrong about that.

What I hear you saying is -- I don't know what I hear you saying, to be frank with you. I mean what's novel about any of this?

[DEFENSE COUNSEL]: My argument is, is that if it wasn't novel, if it wasn't new, then we would have just been able to use the same databases that have been around for all these years that work for the STR, the databases that have been here, that have been used, but we didn't, because we can't, so we had to create new databases, and these databases are limited. They're limited by size.

THE COURT: Is there anything novel about the manner in which the database is created?

[DEFENSE COUNSEL]: They are in the way they are utilized. They are --

THE COURT: No, created.

[DEFENSE COUNSEL]: They're created -- yes. I mean they're created for Y-STR, so they're novel in the extent of how they can be created. I mean it's a different methodology in the way that you are actually analyzing the data. The databases themselves are not the same as the STR databases.

THE COURT: I'm just -- is there anything scientifically novel about the manner in which the database is put together, is created? What's scientifically novel about that? Are there any particularly

new scientific procedures that are subject to any kind of dispute or that are new?

[DEFENSE COUNSEL]: The technique is the same, and Your Honor, I understand what the argument is. The problem is that you're taking something that is being now used that was never used. It's the same as mitochondrial DNA. It's used in cases where I find bones lying in the field somewhere, and I want to find out who this person is, or I want to find my ancestry and go back. It has a purpose.

Like polygraphs. Polygraphs are great. Investigators have been using them for years, but we don't bring them into the Court setting for a reason. The same reason why you have the Y-STR. It's a good tool, it's going to be very helpful in the scientific community, but it shouldn't be brought into the courtroom.

THE COURT: But then you're arguing -- you're not arguing novel, the novel nature, you're arguing the persuasiveness of the evidence generated by that process. Doesn't that go to weight?

[DEFENSE COUNSEL]: There is a ton of issues to be argued to go to weight.

\*　　　\*　　　\*

[DEFENSE COUNSEL]: Well, arguing Y-STR, Your Honor, with all due respect, York County has been the only place in Pennsylvania that I've been able to come across that uses it. There hasn't been any place else in Pennsylvania that --

THE COURT: That doesn't make it unique. That may make it --

[DEFENSE COUNSEL]: New.

THE COURT: But it doesn't make it novel. If the manner in which the information that goes into forming the database, is based upon or is gathered by established non [*sic*] and novel scientific means, how then can the database itself be deemed to be novel?

| | |
|---|---|
| [DEFENSE COUNSEL]: | Because of the way that it's used. |
| THE COURT: | How is the use of it -- how is the use of it scientifically new? |
| [DEFENSE COUNSEL]: | Because it's not there yet.  The databases aren't large enough yet -- |
| THE COURT: | Ma'am, I apologize, the application of this evidence may be novel, but it's not scientifically novel.  It may be used in a new non-scientific way.  Do you not agree? |
| [DEFENSE COUNSEL]: | I agree, and I guess what I am asking the Court to understand is that just because something may be scientifically reliable in a usage does not mean it can be scientifically reliable in all usages, and what we're doing is we're taking something that's out there and trying to adapt it to forensic usage, and it shouldn't be. |
| | And I understand that Your Honor looks at it as more of a weight issue, and I agree that there are many weight issues that come with Y-STR.  I'm asking the Court to consider -- |
| | *     *     * |
| THE COURT: | And what do [the scientific journals] say? |
| [DEFENSE COUNSEL]: | That there [are] limitations on the databases, that there's limited discriminatory power, that they haven't addressed all the geographic concerns with the databases at this point. |

Notes of Testimony, 1/2/2014, at 40-48.

Questions that raise scientifically complex questions are no easy task for courts. Nonetheless, when considering those questions, we remain bound by our standard of review.  Thus, Jacoby is entitled to relief only if he can demonstrate to this Court that the trial court's decision was an abuse of discretion; that is, *inter alia*, the court's

determination was manifestly unreasonable. Under the limited circumstances of this case, we conclude that Jacoby did not make such a showing.

As is evident from the arguments that Jacoby advanced at the hearing, *i.e.*, his opportunity to demonstrate the necessity for a *Frye* hearing, Jacoby could not overcome the trial court's conclusion that his argument was predicated upon the weight that should be assigned to the Y-STR DNA evidence, and not upon the novelty of the database process itself.[14] Repeatedly, Jacoby was forced by the trial court's questioning to concede that the Y-STR databases were not created in a novel fashion that would differentiate the scientific methods of creating these databases from others.

---

[14] The learned dissent posits that we effectively are finding that Jacoby has waived all of the arguments that he outlined in his pre-trial motion, but that were not raised at the hearing. *See* Dissenting Opinoin at 5, n.4. We make no such finding. As noted, our task simply is to determine whether the trial court abused its discretion. The court provided Jacoby with a forum to demonstrate that a *Frye* hearing would be warranted in this case. Jacoby's counsel argued the case as she saw fit. The trial court did not restrain Jacoby's opportunity to present other arguments. The trial court had threshold concerns that Jacoby was attacking only the weight that should be attributed to the DNA results, and not the novelty of the methodologies utilized to reach those results. Given the chance overcome those concerns, Jacoby could not. We merely evaluate the trial court's exercise of discretion based upon the record before this Court.

The arguments highlighted by the dissent pertain to the weight that should be attributed to the evidence, and not the admissibility of that evidence. The dissent notes that Jacoby challenges "the reliability of the statistical conclusions derived from the Y-STR DNA testing," argues that the "database is too small," and maintains that "local databases should be employed to account for profile frequency differences." *See* Dissenting Opinion at 6 (citing Defendant's Ominbus Pretrial Motions at ¶¶60-61). Finally, the dissent points out that Jacoby highlighted differences between Y-STR DNA testing and autosomal DNA testing. Once more, all of these arguments are arguments that can be made to a jury to demonstrate why Y-STR DNA results should not carry the same weight as other types of DNA testing. But they are not challenges to the novelty of the methodology of Y-STR DNA such that a *Frye* hearing would be justified, much less required as a matter of law. They certainly are not so distinguishable from the weight discussion between Jacoby's counsel and the trial court at the hearing that the trial court's failure to grant a full *Frye* hearing cleared the high bar required to manifest an abuse of discretion.

Indeed, Jacoby's attorney conceded that the technique for creating the database was the same as in other DNA databases. Jacoby's arguments were premised substantially upon the fact that Y-STR databases have not yet grown large enough to secure a more reliable result, that they do not account for geographical differences, and that, because of their size and limitations, the results are not sufficiently discriminatory to constitute reliable evidence. These arguments are directed at the weight that should be assigned to that evidence at trial, and not at the novelty of the creation of the databases. They are arguments for a jury.[15]

Jacoby did not satisfy his burden of demonstrating that the aspect of the process that he focused upon was novel such that we could find an abuse of discretion by the trial court. Consequently, he is not entitled to relief.[16]

## IX. Sufficiency of Penalty Phase Evidence

Finally, we consider Jacoby's claim that the evidence was insufficient to support the imposition of a death sentence. As a statutory matter, this Court is required to affirm a death sentence unless we conclude either that the evidence was insufficient to

---

[15] Indeed, Jacoby did just that at trial. The certified record reflects that defense counsel cross-examined Jillian Fesolavich, a forensic biologist at NMS Labs, about the weaknesses of the Y-STR DNA evidence in this case. Notes of Testimony, 9/29/2014, at 417, 422-23, and 433-34. Jacoby also called his own expert, Katherine Cross, who formerly worked for NMS Labs and "did the original extractions and testing of . . . the fingernail samples, and ran the autosomal testing" in this case. N.T., 10/3/2014, at 1104. Ms. Cross elaborated upon the weakness of the application of Y-STR DNA testing in this case. *See generally id.* at 1106-15.

[16] There may be challenges to other aspects of the Y-STR DNA methodologies. Jacoby identified some of those issues in his original pre-trial motion as well as in his brief to this Court. We do not hold that a *Frye* hearing will never be required to assess an aspect of the Y-STR DNA methodology, nor do we foreclose the possibility of relief in other cases where a defendant challenges the admissibility of Y-STR DNA evidence. We hold only that Jacoby's proffer at the hearing was insufficient to demonstrate novelty, and that the trial court did not abuse its discretion in this instance.

support at least one aggravating factor or that the jury's determination was "the product of passion, prejudice, or any other arbitrary factor." 42 Pa.C.S. § 9711(h)(3)(i); *Commonwealth v. Murphy*, 134 A.3d 1034, 1042 (Pa. 2016). The only aggravating factor that was submitted to the jury by the Commonwealth was that "[t]he defendant committed a killing while in the perpetration of a felony." 42 Pa.C.S. § 9711(d)(6). The jury found this factor present beyond a reasonable doubt. *See* Penalty Phase Verdict Slip, 10/9/2014, at 1-2.

Presently, Jacoby acknowledges that "[t]his [C]ourt cannot determine whether the jury gave undue weight to the aggravating factor, for that is not reviewable." Brief for Jacoby at 60. Instead, Jacoby reasserts his claim that the felonies that could have supported the aggravating factor, burglary and robbery, were not supported by sufficient evidence. However, as we have explained above, both convictions were supported by proof beyond a reasonable doubt. Additionally, we have reviewed the certified record, and we conclude that the death sentence was not "the product of passion, prejudice, or any other arbitrary factor," and Jacoby does not forward any substantive argument to the contrary. 42 Pa.C.S. § 9711(h)(3)(i). Therefore, we find no basis to vacate the penalty on sufficiency grounds.

## X. Conclusion and Mandate

Based upon the foregoing, Jacoby is not entitled to relief. The judgment of sentence is affirmed. The Prothonotary is directed to transmit a copy of the record and this opinion to the Governor pursuant to 42 Pa.C.S. § 9711(i).

Jurisdiction relinquished.

Justices Todd and Dougherty join the opinion in full.

Justice Mundy joins Parts I-IV and VI-X of the opinion and files a concurring opinion in which Justice Baer joins.

Chief Justice Saylor joins Parts I-IV, VI, VII, and IX of the opinion and files a dissenting opinion.

Justice Donohue joins Parts I-VII and IX of the opinion and files a concurring and dissenting opinion.