J-A15045-20

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

COMMONWEALTH OF PENNSYLVANIA,   :   IN THE SUPERIOR COURT OF
                                :            PENNSYLVANIA
              Appellee       :
                                  :
                v.                :
                                  :
BARTHOLOMEW NELSON,        :
                                  :
            Appellant      :       No. 2536 EDA 2018

Appeal from the Judgment of Sentence Entered March 9, 2018
in the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0001993-2016
CP-51-CR-0001994-2016
CP-51-CR-0001995-2016

BEFORE:    LAZARUS, J., KING, J. and STRASSBURGER, J.*

MEMORANDUM BY STRASSBURGER, J.:           Filed: January 21, 2021

Bartholomew Nelson (Appellant) appeals from his March 9, 2018 judgment of sentence at CP-51-CR-0001994-2016 for firearms not to be carried without a license and murder of the third degree; at CP-51-CR-0001995-2016 for aggravated assault; and at CP-51-CR-0001993-2016 for aggravated assault. After review, we affirm.

Briefly, "[a]t almost midnight of December 20, 2015[,] gunshots rang out in the 'man cave' of Leotis Martin, leaving him dead, and two others, Reginald Sturgis and Reginald Robinson, injured."[1] Trial Court Opinion, 2/1/2020, at 3 (citation omitted). After responding to a 911 call about a

---

[1] The shootings occurred at the home of Martin in his finished garage – *i.e.*, what was referred to at trial as his man cave.

*Retired Senior Judge assigned to the Superior Court.

triple shooting, police found Sturgis, who had been shot three times, and Robinson, who had been shot once in the abdomen. Both were still alive and taken to the emergency room. Martin was located inside the garage with a gunshot wound to the chest. He was pronounced dead at the scene. The medical examiner later determined that Martin died of a contact or close-range gunshot wound, indicating to the medical examiner that the muzzle of the gun was either lined up directly to Martin's chest or the shooter was within two to four inches of Martin.

Officers searched for the shooter and found Appellant, who matched the description of the shooter, about a 25 minute walk away from Martin's garage. Appellant told police "there was a shooting, it was me, they tried to set me up." N.T., 1/10/2018 at 33. Police arrested Appellant, and charged him at docket 1994 of 2016 with crimes related to Martin's death, at docket 1995 of 2016 with crimes related to the injuries to Sturgis, and at docket 1993 of 2016 with crimes related to the injuries to Robinson. At the jury trial in the matter, there was no dispute that Appellant was the shooter. Instead, Appellant focused his defense on the circumstances of the shootings, arguing that he shot all three people in self-defense.

According to the testimony at trial, on the night of the shootings, Martin had been hosting a get-together in his garage to watch the Philadelphia Eagles football game on the Sunday night television broadcast.

Martin and his close friends Robinson and Sturgis watched the first half of the game together.

Appellant and his nephew, Harry Rivers, watched the first half of the game at a nightclub. Rivers, who had been to Martin's garage a number of times, suggested to Appellant that they finish watching the game at Martin's garage, where they wouldn't have to pay for drinks. Appellant did not know Martin, Sturgis, and Robinson well; he had only been to Martin's garage once a few weeks before the shooting. Nevertheless, he agreed to go.

Rivers called Martin, who told him to come over. Martin identified Rivers and Appellant on his exterior security camera, and let them into the garage. According to the time on the security camera tapes admitted at trial, Appellant and Rivers arrived at 10:08 p.m. during half-time in the game.

Over the next hour and a half, Martin and the four guests, including Appellant, watched the second half of the game, drank alcohol, used cocaine and/or marijuana, and socialized. Sturgis testified that Appellant was cussing a lot when he talked, and Sturgis asked him to tone down the cussing. Appellant initially refused, but after a back-and-forth exchange with Sturgis, Appellant apologized.

Shortly thereafter, the Eagles game ended and the get-together started breaking up. During their testimony, Sturgis, Robinson, and Rivers all agreed that some sort of fight broke out between Appellant and Martin, but their accounts of the incident varied.

Robinson testified that he was talking to Sturgis and Rivers as Appellant and Martin were talking. "[A]ll of a sudden," he saw Appellant "get up and [Martin] jump up." N.T., 1/9/2018, at 91. He was not sure what had happened because he was focused on his conversation with Sturgis and Rivers with his back to the wall. Robinson explained that "[i]t happened so fast because I never seen [Martin] move that fast." *Id.* at 93. He heard "the clinging of some bottles." *Id.* He recalled seeing Martin's back, and "all of a sudden [he] heard three shots" and saw Martin "drop." *Id.* at 91. Robinson "jumped up" and "ran towards [Martin]." *Id.* Appellant shot Robinson in the abdomen and then stepped over him as Robinson lay on the floor. Appellant moved towards the garage door. Robinson heard Rivers say, "Did you get it?" and Appellant responded "no." *Id.* Rivers told Appellant "don't go to my car." *Id.* Robinson remained lying on the floor and was holding his gunshot wound because it was "burning." *Id.* He heard Appellant come back in, shoot Sturgis three times, and then leave. To Robinson's knowledge, the only person who had a gun that night was Appellant.

Sturgis testified that as he was putting his coat on to leave after the game, he "watched [Appellant] jump up" towards the television. *Id.* at 172. Underneath the television, there were bottles of liquor on a shelf. Sturgis heard a "clang" and "ting" and saw a liquor bottle fall, prompting Martin to "jump[] up from his seat" towards the television. *Id.* at 172, 181. He saw Appellant and Martin "scuffle[] for a minute." *Id.* at 172. Specifically, Sturgis

saw the elbows of both Appellant and Martin go back and forth, while Appellant tried to bring Appellant's hands up and Martin was trying to bring Appellant's hands down. *Id.* at 182. "[A]ll of a sudden [Sturgis] heard a shot, and [Martin] hit the ground." *Id.* at 172. Robinson stood up; Appellant then shot Robinson in the stomach, stepped over him, and walked towards the garage door, which then opened. Sturgis asked, "what is going on? Why are you doing this?" *Id.* Appellant came back into the garage, "pointed the gun at [Sturgis] at point blank range[,] and shot [Sturgis] three times."[2] *Id.* Sturgis fell back on the couch during the shooting. One bullet went into his thigh and pierced his stomach; another went through his arm; and the last one went through his armpit and landed in his neck, where it remained at the time of trial. Sturgis called 911 after being shot.

The testimony of Rivers, a defense witness, differed. Rivers testified that a sixth person he knew only as Wade arrived towards the end of the game, and Martin was angry that Wade came over without calling. Martin, Sturgis, and Robinson were standing up and talking to Wade when Appellant decided he wanted to leave. According to Rivers, Wade left and Appellant tried to follow him, but Martin, Sturgis, and Robinson blocked his exit. Appellant sat back down, but got up again to use the bathroom with about

---

[2] Martin's surveillance video showed a person exit and re-enter the garage at 11:51 p.m. Sturgis confirmed that person was Appellant right before Appellant shot him. *Id.* at 163.

five minutes left in the game. Sturgis and Robinson whispered to each other while Appellant was in the bathroom. As Appellant exited the bathroom, Martin, who had been sitting on the couch close to the bathroom, "launched" at Appellant and grabbed him. N.T., 1/10/2018, at 93. Martin "was swinging [Appellant] around like a rag doll." *Id.* at 94. They fell to the ground and were "scuffling" for a few minutes when Rivers "heard a pop, pop." *Id.* Rivers was "stunned" to hear the gunshots. *Id.* Sturgis and Robinson "went towards" Appellant and Appellant fired more shots. *Id.* Rivers did not know how many shots were fired because he was in shock.

Rivers testified that he opened the garage door and told Appellant to leave, and Appellant left on foot. Rivers stayed behind to render aid, but stated he did not touch anyone and just tried "to comfort them with words," particularly Robinson, who said, "[Rivers], I'm shot." *Id.* at 95-96, 108. While Sturgis called 911, Rivers called his father, a retired police officer. Rivers called his father because he "knew it was going to be a situation" and he wanted his father with him because "they are going to assume we did things." *Id.* at 97-98. Rivers left to go get his father[3] and brought him back.

---

[3] During cross-examination, Rivers initially said he did not go to his car prior to leaving to pick up his father. *Id.* at 111. After the Commonwealth showed him video footage from Martin's security camera that showed Rivers inside his car with the overhead light on after the shooting but before he left to get his father, Rivers acknowledged he went to his car. He denied putting anything inside it and does not remember why he went to the car because he was in "panic mode." *Id.* at 115.

Police were there when they returned and the police instructed Rivers to go to the police station to make a statement, which he did.

On cross-examination, the Commonwealth showed Rivers the statement he provided to police just hours after the shooting. In his statement, Rivers told police that Martin and Appellant had a conversation after Appellant came out of the bathroom. Then Martin leapt off the couch and Martin and Appellant were "tussling," and Martin "tussled [Appellant] to the ground." *Id.* at 133. Rivers "just thought they was playing [*sic*] … and then [he] heard pop, pop, pop. He[4] just went crazy." *Id.* Appellant "got up, and then just started shooting. Letting go, non-stop on everything and everybody." *Id.* At trial, Rivers backtracked and denied saying Appellant shot everywhere; he claimed Sturgis and Robinson came towards Appellant, prompting Appellant to shoot them. *Id.*

To explain discrepancies between his statement and his testimony, Rivers asserted that he had corrected multiple errors in the statement by highlighting the incorrect parts. Rivers acknowledged that his signature was on every page and no highlights appeared, but claimed he only read one page of the statement and was never shown the corrected version. Detective Donald Marano, on the other hand, testified he read the entire statement

---

[4] It is unclear whether Rivers was referring to Appellant or Martin by his use of "he"; the trial court attributes the "he" to Appellant. *See* Trial Court Opinion, 2/1/2020, at 9.

aloud to Rivers, and he gave Rivers the opportunity to correct the statement, but he made no corrections and signed and dated every page. *Id.* at 185-86.

At the conclusion of trial, a jury convicted Appellant of the above-referenced crimes. On March 9, 2018, Appellant was sentenced to concurrent terms of incarceration of 7½ to 15 years for each aggravated assault charge, 2½ to 5 years for the firearm charge, and mandatory life without parole for the murder charge. The sentence for third-degree murder was mandatory due to Appellant's prior conviction for voluntary manslaughter. *See* 42 Pa.C.S. § 9715(a).

Appellant filed a post-sentence motion, which was denied by operation of law in July 2018. Appellant's attorney did not file an appeal, but Appellant's appellate rights were reinstated following a timely-filed petition under the Post Conviction Relief Act, 42 Pa.C.S. §§ 9541-9546. This appeal filed *nunc pro tunc* followed.[5] Both Appellant and the trial court complied with Pa.R.A.P. 1925.

---

[5] On December 21, 2018, this Court issued an order directing Appellant to show cause why his appeal should not be quashed pursuant to ***Commonwealth v. Walker***, 185 A.3d 969 (Pa. 2018) (holding that notices of appeal filed after June 1, 2018 must be quashed if the appellant fails to file separate notices of appeal from a single order resolving issues arising on more than one lower court docket). Appellant responded, noting that although each notice of appeal contained all three docket numbers, he filed a separate notice of appeal at each docket. After Appellant responded, this
*(Footnote Continued Next Page)*

Appellant presents two issues on appeal: (1) whether the verdicts for third-degree murder and aggravated assault were against the weight of the evidence, and (2) whether "the trial court err[ed] in erroneously advising Appellant that evidence of drug dealing and/or his priors for same would be admissible[.]" Appellant's Brief at 4 (suggested answers, footnote, and unnecessary capitalization omitted).

We begin with Appellant's challenge to the weight of the evidence. The trial court must use the following standard in assessing a weight claim.

> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice. It has often been stated that a new trial should be

_(Footnote Continued)_ ─────────────

Court discharged the rule to show cause and deferred the issue to the merits panel.

Upon review, we conclude Appellant did indeed file three separate notices of appeal, as evidenced by the independent time stamps. **See Commonwealth v. Johnson**, 236 A.3d 63, 66 (Pa. Super. 2020) (_en banc_) (determining that time stamps in different locations and/or different times of day indicate that separate notices of appeal were filed). Moreover, we need not quash based upon the listing of multiple docket numbers on each notice of appeal. **See Commonwealth v. Johnson**, 236 A.3d 1141, 1148 (Pa. Super. 2020) (_en banc_) ("We should not invalidate an otherwise timely appeal based on the inclusion of multiple docket numbers, a practice that the Rules [of Appellate Procedure] themselves do not expressly forbid."). Having determined that Appellant complied with **Walker** and Pa.R.A.P. 341, we may proceed.

awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail.

***Commonwealth v. Izurieta***, 171 A.3d 803, 809 (Pa. Super. 2017) (citation omitted).

On appeal, we evaluate the trial court's ruling with the following in mind.

Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

***Commonwealth v. Beatty***, 227 A.3d 1277, 1285-86 (Pa. Super. 2020) (citations omitted).

In the instant case, Appellant's analysis of his weight challenge is underdeveloped. ***See*** Appellant's Brief at 12. Although he makes no attempt to highlight any differences, it appears Appellant is attempting to argue that discrepancies between the accounts of Rivers, Sturgis, and Robinson were so "drastic[]" that the jury's verdict should have shocked the trial court's sense of justice. ***Id.*** Furthermore, Appellant claims "the shooting could have easily

[] been in self-defense" because "Appellant was outnumbered after being attacked by [Martin.]" *Id.*

The trial court explained in its Pa.R.A.P. 1925(a) opinion why the jury's guilty verdict did not shock its sense of justice.[6] The trial court found the accounts of Robinson and Sturgis to be consistent on key points, and any discrepancies to be minor. Both testified that Martin fell to the ground only after they heard gunshots; that Appellant shot Robinson as Robinson moved towards Appellant after Appellant shot Martin; and that Appellant left and then re-entered the garage before shooting Sturgis three times. While Rivers' version differed from Sturgis and Robinson's versions, the Commonwealth discredited Rivers by impeaching him with his original police statement from the night of the murder. The trial court emphasized that the jury was entitled to credit Sturgis and Robinson over Rivers. Moreover, under all three accounts, the only person who had a gun was Appellant. The trial court pointed to its provision of a self-defense instruction to the jury, and found the rejection of the self-defense theory was within the jury's province, particularly where Appellant used a gun in what was otherwise a

---

[6] As noted *supra*, Appellant's post-sentence motion was denied by operation of law pursuant to Pa.R.C.P. 720(B)(3)(a). "[W]hen a claim is denied by operation of law, the effect of the denial operates in the same manner as if the court had denied the motion itself." **Commonwealth v. Upshur**, 764 A.2d 69, 73 (Pa. Super. 2000) (*en banc*). Therefore, we may review Appellant's weight claim as if the trial court ruled on it directly. **Id.** Furthermore, we have the benefit of the trial court's analysis of Appellant's weight claim in its Pa.R.A.P. 1925(a) opinion.

fist fight, and re-entered the garage after he was out of harm's way to shoot Sturgis. Trial Court Opinion, 2/1/2020, at 12-14.

The Commonwealth urges us to find waiver, contending that Appellant presented his argument in his brief differently than he did in the post-sentence motion. *See* Commonwealth's Brief at 8 (urging this Court to find waiver). Improper preservation of a challenge to the weight of the evidence before the trial court renders the challenge waived on appeal. *See* Pa.R.Crim.P. 607(A) (stating that challenges to the weight of the evidence must be raised with the trial court before sentencing or in a post-sentence motion); Pa.R.A.P. 302(a) (stating that issues not raised before the trial court are waived and cannot be raised for the first time on appeal); *Commonwealth v. Thompson*, 93 A.3d 478, 490 (Pa. Super. 2014) (holding failure to preserve properly weight claim in post-sentence motion, by written motion before sentencing, or orally on the record prior to sentencing results in waiver, even if trial court addresses the issue in its opinion).

In his post-sentence motion, Appellant argued the jury's verdict was against the weight of the evidence because "the incident occurred when the defendant was highly intoxicated and/or defendant's actions were justifiable under the circumstances." Post-Sentence Motion, 3/13/2018, at 1. To the extent Appellant argues in his brief that the verdict is against the weight of

the evidence solely due to inconsistencies amongst the testifying witnesses, such argument is waived for failure to preserve it before the trial court.[7]

To the extent Appellant is arguing that the weight of the evidence points to self-defense, we agree with the trial court's assessment of the evidence and discern no abuse of discretion in its rejection of Appellant's challenge.[8] Appellant's self-defense argument is premised upon a version of events set forth by Rivers. The jury's verdict demonstrates it either rejected

_____

[7] Nor would it have merit if not waived. **See Commonwealth v. Jacoby**, 170 A.3d 1065, 1080 (Pa. 2017) ("A jury is entitled to resolve any inconsistencies in the Commonwealth's evidence in the manner that it sees fit.").

[8] Our deference to the trial court's observations and findings notwithstanding, **see Commonwealth v. Widmer**, 744 A.2d 745, 753 (Pa. 2000), we are skeptical of the trial court's conclusion on one point. It states that no one, not even Rivers, testified that Sturgis "went after" Appellant. Trial Court Opinion, 2/1/2020, at 12-13. However, Rivers did testify that after Martin was shot, "Reggie and them came towards him and [Appellant] started shooting." N.T., 1/10/2018, at 129-30. When the Commonwealth's attorney asserted that Sturgis and Robinson never laid a finger on Appellant, Rivers insisted that "[t]hey tried to" and "[t]hey were coming at [Appellant] but he started firing." **Id**. According to Rivers' testimony, "as he was coming out he shoots one Reggie and while he was trying to get out, Reggie kept coming at him and he was shooting at him while he kept coming at him, and I was trying to open the garage." **Id.** Rivers' statements are confusing because he uses vague descriptors (i.e., a male pronoun although there were multiple men and the first name Reggie although both Sturgis and Robinson are named Reggie). In context, it seems Rivers meant Appellant shot Robinson because Robinson approached him after Martin was shot and Appellant shot Sturgis because Sturgis kept coming at him as Appellant was trying to leave the garage. Nevertheless, no matter how Rivers' testimony is construed, we agree with the trial court's overall conclusion that the jury was entitled to believe Sturgis and Robinson over Rivers and resolve any conflicts against Appellant.

Rivers' testimony as incredible or as failing to overcome the Commonwealth's disproving of self-defense. "It is well settled that the jury is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses." **Commonwealth v. Houser**, 18 A.3d 1128, 1136 (Pa. 2011) (comparing Houser's incredible self-serving self-defense testimony to testimony of other witnesses and ballistics evidence offered by the Commonwealth and concluding trial court did not abuse its discretion in determining that the jury's verdict did not shock sense of justice). We discern no abuse of discretion in the trial court's determination that the verdict was not against the weight of the evidence.

In his second issue, Appellant contends he did not testify at trial because the trial court erroneously advised him that the Commonwealth could introduce certain evidence into the record if he testified. Appellant's Brief at 13, 15-20.

Like his first issue, Appellant's argument is not developed fully. This time, however, we find it impedes our appellate review. Appellant does not explain or point to any place in the record that details what, specifically, Appellant believes the trial court erred in refusing to exclude, which allegedly forced Appellant to decide not to testify. He just vaguely refers to "prior convictions and/or portions of his statement [to police] relating to drug dealing" and points our attention to 20 pages in the transcript of his trial

where the trial court colloquied him regarding his decision not to testify at trial. Appellant's Brief at 13 (citing N.T., 1/10/2018, at 163-83).

The discussion at trial does not provide much clarity. During the discussion, Appellant initially decided not to testify; changed his mind and decided he wanted to testify; then changed his mind again and decided he did not want to testify. The trial court thoroughly explained his right to testify in his own defense or remain silent and provided an opportunity for Appellant to consult with his counsel privately. It is clear Appellant decided not to testify because he did not want to risk the jury holding certain evidence against him. What remains unclear after reading Appellant's brief and the transcript is what exactly that evidence is.

It appears Appellant has some type of past convictions, but neither his brief nor the portion of the transcript to which he cites clarifies of which crimes he was convicted and when. It also appears that Appellant made some type of references to drug dealing in his statement to police, but it is unclear who dealt the drugs and how such dealing may relate to this case. If his statement to police appears in the certified record, Appellant does not point us to where. Even the trial court was confused at trial as to which portions of Appellant's 52-page statement he was concerned could be introduced to the jury. *See* N.T., 1/10/2018, at 163-83.

We are unable to decide Appellant's claim in a vacuum. The references in Appellant's brief and at trial are non-specific or incomplete. They render

us unable to determine if the trial court erred by informing Appellant that such evidence could be introduced during cross-examination of Appellant or on rebuttal if he testified. Because we do not know what specifically Appellant was trying to exclude, appellate review of the trial court's decision to include it, is hindered. Such lack of specificity impedes appellate review; accordingly, we find this issue waived. *See Commonwealth v. Kane*, 10 A.3d 327, 331 (Pa. Super. 2010) (discussing principle that where "defects in a brief impede our ability to conduct meaningful appellate review, we may dismiss the appeal entirely or find certain issues to be waived").

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.

Prothonotary

Date: 1/21/21