J-A27044-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
  :           PENNSYLVANIA
  :
v.   :
  :
  :
JERRY LAMAR BUTLER   :
  :
Appellant   :   No. 3002 EDA 2024

Appeal from the Judgment of Sentence Entered September 19, 2024
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s): CP-46-CR-0001074-2024

BEFORE: BOWES, J., MURRAY, J., and BECK, J.

MEMORANDUM BY BECK, J.:          **FILED FEBRUARY 3, 2026**

Jerry Lamar Butler ("Butler") appeals from the judgment of sentence entered by the Montgomery County Court of Common Pleas ("trial court") following his convictions of second-degree murder, robbery, and conspiracy.[1] Butler challenges the trial court's ruling regarding an expert witness, the denial of his motion to suppress a search warrant, and the constitutionality of a sentence of mandatory life imprisonment without parole ("LWOP") for individuals convicted of second-degree murder. We affirm.

**Facts and Procedural History**

The Commonwealth jointly tried Butler, Daquan Allen ("Allen"), and Damon Brantley ("Brantley") for their roles in the murder of William Carter

_____

[1] 18 Pa.C.S. §§ 2502(b); 3701; and 903.

("the victim").  A fourth defendant, Justin Davis ("Davis"), was sixteen at the time of the shooting and testified against his three co-conspirators.  The trial court summarized the basic facts as follows:

> The conspiracy was set in motion by Katherine Emel ("Emel").  Emel had seen the victim with a wad of money earlier that day, and told Allen that the victim owed her money.  Butler, Brantley, Allen, and Justin Davis drove to the victim's location, supplied by Emel, in a stolen Toyota Rav4.  They parked behind the victim's Buick LaSabre and when the victim went to his car, they got out of their car, robbed and shot the victim once in the head.  They fled the scene, abandoned the Rav4 near the crime scene, and switched to a different car, an[] Infinity, to avoid detection.  Later, Brantley went back to set fire to the Rav4.  Butler, Brantley, and Allen fled to a residence in Endicott, New York, where they were apprehended on January 31, 2024.

Trial Court Opinion, 1/21/2025, at 1-2.

The jury convicted Butler of all three charges and the trial court imposed the mandatory sentence of LWOP.  Butler filed a timely post-sentence motion, and a timely notice of appeal following its denial.  Both Butler and the trial court have complied with Pa.R.A.P. 1925.  He raises three claims for our review:

1. Whether the trial court erred in denying [Butler]'s request for a … hearing on the admissibility of DNA evidence generated using STRmix probabilistic genotyping software, where the defense expert raised substantial questions about the reliability and general acceptance of STRmix as applied to low-template, multi-contributor mixtures such as those presented in this case?

2. Whether the trial court erred in denying [Butler]'s motion to suppress historical cell site location information (CSLI)?

3. Whether the mandatory sentence of life without parole imposed for second-degree (felony) murder under 18 Pa.C.S. § 1102(b) and 61 Pa.C.S. § 6137(a)(1) violates Article I, Section 13 of

the Pennsylvania Constitution and the Eighth Amendment to the United States Constitution?

Butler's Brief at 4.

### *Frye* Hearing

Butler's first claim addresses the trial court's denial of his request to hold a ***Frye***[2] hearing on the admissibility of the expert testimony linking his DNA to the victim.

We review evidentiary decisions, including whether the trial court erred in not granting a ***Frye*** hearing, for an abuse of discretion. ***Commonwealth v. Jacoby***, 170 A.3d 1065, 1090 (Pa. 2017). "An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused." ***Id.*** (quoting ***Commonwealth v. Walker***, 92 A.3d 766, 772 (Pa. 2014)).

Our Rules of Evidence permit the admission of expert testimony if "the expert's methodology is generally accepted in the relevant field." Pa.R.E. 702(c). This "general acceptance" rule is based on the standard set forth by ***Frye***.

The ***Frye*** test is a two-step process. First, the party opposing the evidence must show that the scientific evidence is "novel." "This Court has

---

[2] ***Frye v. United States***, 293 F. 1013 (D.C. Cir. 1923).

explained that scientific evidence is 'novel' when 'there is a legitimate dispute regarding the reliability of the expert's conclusions.'" *Commonwealth v. Cramer*, 195 A.3d 594, 606 (Pa. Super. 2018) (quoting *Commonwealth v. Safka*, 95 A.3d 304, 307 (Pa. Super. 2014)). If the moving party has identified novel scientific evidence, then the proponent of the scientific evidence must show that "the expert's methodology has general acceptance in the relevant scientific community" despite the legitimate dispute. *Commonwealth v. Foley*, 38 A.3d 882, 888 (Pa. Super. 2012) (citations omitted). For *Frye* to apply, the dispute as to "the reliability of an expert's conclusions" pertains to the methodology used to reach that conclusion, not to the conclusion itself. *Grady v. Frito-Lay*, 839 A.2d 1038, 1047 (Pa. 2003).

At trial, the Commonwealth called Thomas Rataic, a forensic DNA scientist employed by the Pennsylvania State Forensic DNA Lab. N.T., 9/12/2024, at 300. Rataic discussed "STR or short tandem repeat analysis," which "allows us to isolate specific regions of the DNA molecule where short sequences [are] known to rerepeat." *Id.* at 304. These repeating regions "vary in length from one person to another" and thus can differentiate individuals. *Id.*

Rataic tested several items to determine if DNA from the defendants was present. He explained that some of the items were discarded as unusable "due to complexity of mixtures." *Id.* at 310. According to Rataic, if the "mixture profile is over four people ... it's automatically uninterpretable" per

- 4 -

lab policy.  *Id.* at 311.  He stated that prior to 2020, his lab would "only interpret it … if there was a single major [contributor]" to the profile.  *Id.*  He explained that in 2020, however, his lab "brought online a probabilistic genotyping system called STRmix which allows us to use more information that is in the profile than we could on our own." *Id.* at 312.  With that system, the lab "can interpret a four-person mixture basically no matter what." *Id.*

Turning to the items linking Butler to the victim, Rataic obtained "a DNA profile consistent with a mixture of four contributors" from an item designated as item Q9, described as the victim's "pants front right pocket interior[.]" *Id.* at 314.  Rataic testified that Butler "can be included as a potential contributor to this mixture profile." *Id.*  He calculated that the profile was "520,000 times more likely" to have originated from a mixture of the victim, Butler, and two unknown, unrelated individuals than if it had originated from a mixture of the victim and three unknown, unrelated individuals.  *Id.* at 314-15.[3]

Next, Rataic testified that "a DNA profile consistent with the mixture of four contributors was obtained from the pants front left pocket interior" of the victim, designated as item Q11.  *Id.* at 318.  Again, Butler was included as a

_____

[3] We note that the notes of testimony use the word "related" not "unrelated" pertaining to Rataic's testimony solely as to Q9.  *See generally* N.T., 9/12/2024, at 314-19.  As it is incongruous that Rataic would have used such a vastly different comparison group for only one of the three DNA samples tested, we logically conclude that this was either a typo or an unintentional misstatement, and Rataic instead intended to testify that the comparison group for Q9 was also as to "unrelated individuals." *Id.*

potential contributor.  For this item, the "profile obtained from this item is 71 quadrillion times more likely if it originated from … the victim … Butler … and two unknown unrelated individuals than if it had originated from … the victim … and three other unknown unrelated individuals in the population."  *Id.*

Finally, he testified that "a DNA profile consistent with a mixture of four contributors was obtained from the sweatshirt front pouch pocket interior," designated as item Q12.  *Id.* at 319.  Butler was again "included as a potential contributor" to the mixture.  *Id.*  The "profile obtained from this item is 140 million times more likely" than a profile originating from the victim and three other unknown and unrelated individuals.  *Id.*

During pretrial discovery the Commonwealth declared its intent to offer expert testimony in line with the foregoing summary.  Butler filed a motion seeking a *Frye* hearing.  Butler's motion stated that "the reliability of probabilistic genotype software like STRmix may be validated for simpler DNA mixtures involving less than three … contributors," but argued that the "reliability … for analyzing more complex mixtures"—defined as those involving "four contributors" or where "the minor contributor contributes less than 20% of the DNA"—has not been established.  Motion in Limine, 9/6/2024, ¶ 22.  Butler cited in support a 2016 report by the President's Council of Advisors on Science and Technology ("PCAST").  *Id.*

Additionally, Butler retained expert witness Katherine Cross, who reviewed the discovery and "opined that the conclusions … cannot be deemed

reliable based, in part, on the lack of available studies to establish the reliability of STRmix method" for situations where "there are three … or more contributors … and where the minor contributor of interest has a contribution of less than 20%." *Id.* ¶ 25. The motion attached Cross' report and quoted her conclusion:

> The assigned percentage of contribution for … Butler in these samples is low. The statistical reports generated in the laboratory samples is low. The statistical reports generated in the laboratory notes allocate percent contributions for each individual in the mixture. For Q9, Mr. Butler is assessed at 6% contribution. For Q11, Mr. Butler is assessed at 8% contribution. For Q12, Mr. Butler is assessed at 4%. These percentages are unreliable in three[-]person (and higher) mixtures. The samples Q9, Q11, and Q12 do not meet the 20% of the sample or the minimum level of template required for the method. The total template of all contributors exceeds the minimum as does the amount for … [the victim]'s contribution, but the minor contributors do not. Laboratories have policies regarding interpretation of three (or more) person mixtures. Many laboratories will not interpret three or more person mixtures, with the exception of a clear major contributor. The clear major contributor can be resolved, but any minor contributors are listed as inconclusive or even excluded, depending on the alleles detected.

*Id.* ¶ 26.

The trial court held a hearing on the motion, at which the parties "agreed that the defense can proceed on Ms. Cross' letter of opinion dated September 6, 2024, and an e-mail she sent, which is sort of like a supplement to that opinion, on September 9, 2024." N.T., 9/10/2024, at 12. Butler stated that his argument "is very limited. We're not saying that STRmix is not reliable in all circumstances." *Id.* at 13. Instead, Butler argued that "STRmix has not been proven to be reliable … when you have multiple confounding factors that

complicate the DNA sample. And those, in this case, are the number of contributors." *Id.* at 13-14. Butler also cited the fact that his DNA was present at low levels, as his percentage contribution on two of the items was eight and six percent, respectively, and "even less" on the remaining item. *Id.* at 14. Additionally, Butler argued "there's significant overlap in the alleles of the victim in this case, who is presumed to be the primary contributor to the DNA samples that were recovered from his clothing, because that's what we're talking about here." *Id.;* Motion in Limine, 9/6/2024, Exhibit D at 1 (Cross' report). As asserted by Butler, these "multiple confounding factors" established the novelty of STRmix. N.T., 9/10/2024, at 18.

The Commonwealth presented its counterargument, which the court accurately summarized in its written opinion supporting its denial of a *Frye* hearing:

> The Commonwealth explained that the STRmix software had been used since 2012, and a total of 114 labs use this software throughout the world, including 91 labs in North America, including the FBI, the Department of Alcohol, Tobacco, Firearms, and Explosives. The Commonwealth suggested that the issues that defense counsel has raised go to the weight of that evidence.
>
> The Commonwealth addressed that 2016 study, relied on by the defense expert to opine that the use of STRmix technology with multiple contributors was unreliable. The Commonwealth noted that the 2016 study was limited and that it did not conclude the use of STRmix for a complex DNA sample was unreliable; rather, it concluded that future testing was warranted. Additionally, the Commonwealth noted an article published in 2017 as a response to the 2016 study entitled, Internal Validation of STRmix- a Multi Laboratory Response to PCAST. This 2017 article set out the limitations of the 2016 study, and the 2017 article reported on a more robust study of the STRmix technology

in complex DNA samples, and concluded that "the material provided demonstrate a foundational validity of STRmix for complex mixed DNA profile to levels well beyond the complexity and contribution levels suggested by PCAST." The Commonwealth further [c]ited to another study published by the FBI in its peer review literature entitled, *Internal Validation of STRmix of the Interpretation of Single Source and Mixed DNA Profiles*. The Commonwealth highlighted the conclusion of the FBI study, that the findings support that STRmix is sufficiently robust for implementation in forensic laboratories based upon complex testing of over 300 samples, including ranges from one to five contributors.

Trial Court Opinion, 1/27/2025, at 13-14 (citations omitted).

Following its review, the trial court concluded "that the defense had not satisfied the threshold *Frye* requirement that the methodology being challenged was novel." *Id.* at 14.

We conclude that the trial court did not abuse its discretion. Butler argues that if "he did not establish a legitimate dispute regarding the reliability of the Commonwealth's DNA expert's conclusions, it is difficult to conceive of any scenario in which a Frye hearing would ever be warranted." Butler's Brief at 24. This argument is tied to his expert testimony. He argues that he

did precisely what the law requires to establish entitlement to a *Frye* hearing: [Butler] presented an opinion from a qualified expert, Katherine Cross, who explained[] why the application of STRmix to these complex, low-level mixtures with multiple contributors lacked validation as a reliable method of analyzing such DNA samples.

*Id.* at 24-25. He discusses the 2016 PCAST report, Cross' expert opinion, and her supplemental email, and maintains that her "opinions explicitly disputed the reliability of Mr. Rataic's conclusions. Accordingly, ... Butler plainly

satisfied his preliminary burden of establishing a 'legitimate dispute regarding the reliability of the expert's conclusions." ***Id.*** at 28-29 (quoting ***Commonwealth v. Bonnett,*** 239 A.3d 1096, 1102 (Pa. Super. 2020)).

We conclude that Butler failed to make the required showing that the trial court abused its discretion. Butler appeared to agree that STRmix generally produces reliable results. ***See*** N.T., 9/10/2024, at 13 (Butler noting that the argument "is very limited" and is not "that STRmix is not reliable in all circumstances."). His claim was that the test results were unreliable in this particular case because of the combination of multiple variables—namely, the presence of four contributors, the low contribution percentage by Butler, and shared alleles between the victim and Butler.

Butler's argument is that the trial court, and this Court on appeal, must credit his expert's opinion to establish that there is a legitimate dispute regarding the reliability of Ratiac's conclusions. However, beyond citing one study, Cross did not establish that scientists in the field view STRmix as unreliable under these circumstances. Butler effectively presented a battle of the experts, and the trial court concluded that the arguments "presented a question of weight and not admissibility." Trial Court Opinion, 1/31/2025, at 14.

Cross' expert report cited a study suggesting that STRmix produced unreliable results when more than three contributors are present in a sample and where the relevant DNA contribution level is low. Conversely, the

Commonwealth argued, and the trial court accepted, that the sole study referenced by Cross had been addressed and debunked a year later. Furthermore, an FBI study concluded "that STRmix is sufficiently robust … based upon complex testing of over 300 samples, including ranges from one to five contributors." *Id.* at 13-14.

We further find compelling our Supreme Court's decision in *Jacoby*, a case involving a different type of DNA testing. The Commonwealth's expert there used Y-STR DNA, which involves STR sequencing focused on the Y chromosome. *See generally Jacoby*, 170 A.3d at 1091. The Commonwealth obtained scrapings from underneath the murder victim's fingernails and submitted those items for Y-STR DNA testing. "A sample from [the victim]'s left hand produced a full Y–STR profile from a single contributor. Further testing revealed that Jacoby and all of his male relatives could not be excluded as the source of the sample." *Id.* at 1073.

Jacoby requested a *Frye* hearing, arguing that Y-STR is weaker than other types of testing "because instead of making a match, the result can merely indicate that Jacoby and all his male relatives cannot be ruled out." *Id.* (citation and quotation marks omitted). The Court concluded that Jacoby failed to establish an abuse of discretion:

> Questions that raise scientifically complex questions are no easy task for courts. Nonetheless, when considering those questions, we remain bound by our standard of review. Thus, Jacoby is entitled to relief only if he can demonstrate to this Court that the trial court's decision was an abuse of discretion; that is, inter alia, the court's determination was manifestly unreasonable.

Under the limited circumstances of this case, we conclude that Jacoby did not make such a showing.

Jacoby could not overcome the trial court's conclusion that his argument was predicated upon the weight that should be assigned to the Y–STR DNA evidence, and not upon the novelty of the database process itself. Repeatedly, Jacoby was forced by the trial court's questioning to concede that the Y–STR databases were not created in a novel fashion that would differentiate the scientific methods of creating these databases from others. Indeed, Jacoby's attorney conceded that the technique for creating the database was the same as in other DNA databases. Jacoby's arguments were premised substantially upon the fact that Y–STR databases have not yet grown large enough to secure a more reliable result, that they do not account for geographical differences, and that, because of their size and limitations, the results are not sufficiently discriminatory to constitute reliable evidence. These arguments are directed at the weight that should be assigned to that evidence at trial, and not at the novelty of the creation of the databases. They are arguments for a jury.

*Id.* at 1094–95 (footnotes and citations omitted).

In this posture, where Butler bore the burden of showing "novelty" under *Frye*, the trial court could not simply credit Cross' view to establish a legitimate dispute. In *Commonwealth v. Topa*, wherein our Supreme Court adopted *Frye*, the Commonwealth wished to present an expert to testify that Topa made a phone call based on "voiceprint evidence." *Commonwealth v. Topa*, 369 A.2d 1277, 1279 (Pa. 1977). The Court stressed it did "not question the sincerity of [the expert's] testimony" and "respect[ed] his considerable expertise." *Id.* at 1281. It concluded, however, that "his opinion, alone, will not suffice to permit the introduction of such scientific evidence into a court of law. Admissibility of the evidence depends upon the

[g]eneral acceptance of its validity by those scientists active in the field to which the evidence belongs." *Id.*

Similarly, we do not and cannot question Cross' opinion or her considerable expertise. At the same time, neither the trial court nor this Court can simply credit one expert's view over another as to the reliability of STRmix in this case. "One of the primary reasons we embraced the *Frye* test in *Topa* was its assurance that judges would be guided by scientists when assessing the reliability of a scientific method." *Frito-Lay*, 839 A.2d at 1044-45. Thus, when faced with competing expert opinions, neither the trial court nor this Court may simply select one of the two opinions. "[I]t is no part of the trial court's function to assess whether it considers those theories, techniques[,] and/or conclusions to be accurate or reliable based upon the available facts and data." *Walsh Est. of Walsh v. BASF Corp.*, 234 A.3d 446, 458 (Pa. 2020).

The correctness of the trial court's decision is further evidenced by the email treated as a supplement to Cross' report and entered at the hearing. Therein, Cross addressed the 2017 article noted by the Commonwealth, stating:

> I am very familiar with this article. It addresses multiple contributors, low contribution, and overlap, but not in combination. It also addresses false inclusions due to common alleles. Anything under 500,000 can be due to chance based on this article and the FBI Internal validations. I don't know of any published or validation studies that specifically look at stochastic effects due to low contribution + significant overlap with an assumed contributor (who is also the major contributor) + three

- 13 -

or more contributors in the same sample. **I think this case presents a unique scenario that is not generally addressed in validation studies.** It is basically a "worst case scenario" of issues that can arise in mixture interpretation.

Exhibit C, 9/1/2024 (emphasis added).

In other words, Cross stated her opinion that STRmix produces an unreliable result in this specific circumstance. The *Frye* rule, however, "applies to an expert's methods, not his conclusions[.]" *Frito-Lay*, 839 A.2d at 1047; *see also Jacoby*, 170 A.3d at 1095 n.14 ("[T]he dissent points out that Jacoby highlighted differences between Y–STR DNA testing and autosomal DNA testing. Once more, all of these arguments are arguments that can be made to a jury to demonstrate why Y–STR DNA results should not carry the same weight as other types of DNA testing."). Indeed, Cross presented a substantially similar conclusion when she served as the expert for Jacoby, which our Supreme Court found was properly presented to the jury, but not the basis for a *Frye* hearing. *See Jacoby*, 170 A.3d at 1095 n.15.

Butler was required to establish that the use of STRmix in this case was "novel." We find no error in the trial court's ruling that he failed to carry his burden of proof. No relief is due.

**Motion to Suppress**

Butler's second argument alleges that the trial court erred by failing to suppress historical cell site location information ("CSLI") data. Butler argues that the Commonwealth's affidavit of probable cause failed for two reasons. First, it was "overbroad in its temporal scope[.]" Butler's Brief at 33. Second,

it "failed to set forth sufficient facts to establish probable cause that the CSLI would yield evidence of a crime or contraband." *Id.*

The record reflects that Montgomery County Detective Bureau Detective Mark Minzola attached a twenty-nine-page affidavit of probable cause requesting a warrant to obtain from AT&T records concerning the phone number 267-854-5767, which, as discussed below, was a number attributed to Butler. The affidavit detailed the results of a joint investigation conducted by the Montgomery County Detective Bureau and the Norristown Police Department. It related that officers responded to Powell and Wood Streets in Norristown, Pennsylvania on January 20, 2024, at 7:53 p.m. and found Carter's body. Affidavit of Probable Cause, 1/28/2024, at 4. Investigators obtained surveillance video and saw a Toyota RAV-4 park several feet behind Carter's parked and unoccupied vehicle. *Id.* at 6. Less than a minute later, Carter is depicted exiting a Powell Street residence. The video shows three males exit the RAV-4, with the driver remaining inside. The three males jointly rob Carter and one of the males shoots and kills Carter. *Id.* at 7. The three males reentered the RAV-4 and fled the scene.

The affidavit next details the discovery of the burning RAV-4 after a 911 call at approximately 3:04 a.m. on January 21, 2024. *Id.* at 8. Investigators recovered the VIN and learned it had been reported stolen on December 21, 2023. *Id.* Using license plate readers, detectives learned the vehicle had visited King of Prussia Mall on January 16, 2024, and surveillance video from

the mall showed the vehicle dropping off a female. *Id.* This female was identified and interviewed; she disclosed that her roommate, Leilah Chang, drove the RAV-4 that day. *Id.* at 10. Investigators visited the apartment and spoke with Chang. Authorities learned that Chang was dating codefendant Brantley and, following additional investigation, linked Brantley to Carter's murder. *Id.* at 13-14.

In tandem with the foregoing events, the affidavit also sets out that a confidential source informed Lieutenant Detective Todd Richard that Brantley and Butler both participated in the robbery and murder. *Id.* at 15. The source related that he or she learned the information from Butler's sister, Gieara Johnson-Butler. *Id.* The source stated that Johnson-Butler identified Butler from still photographs released to the media by the police, and the source provided screenshots showing relevant text messages between the source and Johnson-Butler. *Id.*

Detectives then obtained a search warrant for Johnson-Butler's phone. The phone's call log showed a conference phone call lasting sixteen minutes and twenty seconds between Johnson-Butler, Brantley, Butler, and two others. *Id.* at 17. Her saved contacts included Butler, whose number was listed as 267-854-5767. *Id.*

Detective Minzola then set forth that based upon his "training, knowledge, and experience," criminals frequently "utilize their cellular

telephones if [sic] furtherance of their illicit activity." *Id.* at 21. He elaborated:

> Criminals have used their cellular telephones before, during and after committing crimes. They employ their cellular telephone communications to plan, execute and flee their crimes. It is equally important for criminals to stay in touch with their co-conspirators for the purposes of successfully committing their crime(s), eluding detection and/or capture from the police.

> In addition, knowing how cellular telephones operate and the respective records which are generated from such usage, offer an unique opportunity for law enforcement to utilize these records to either prove or disprove an individual's general location on a specific date and time.

> Based upon Detective Minzola's training, knowledge and experience, he has learned that PROVIDERS are companies that provide[] cellular communications service to the general public. In order to provide this service, many cellular service PROVIDERS maintain antenna towers ("cell towers") that serve and provide cellular service to devices that are within range of the tower's signals. Each cell tower receives signals from wireless devices, such as cellular phones, in its general vicinity. By communicating with a cell tower, a wireless device can transmit and receive communications, such as phone calls, text messages, and other data.

*Id.* at 21-22. Detective Minzola's affidavit requested historical CSLI for January 8, 2024, to January 26, 2024.[4]

On May 23, 2024, Butler filed an omnibus motion to suppress. Of relevance here, Butler alleged that the warrant "was overbroad and further

_____

[4] The affidavit sought the following categories of data: "subscriber/ billing information, call detail records, [and] call detail records with cell site information and time advance records." Affidavit of Probable Cause, 1/28/2024, at 22. The parties use the generic label "CSLI" for all data obtained, and we therefore do the same.

failed to identify with particularity the information sought to be search[ed] for and seized," and that law enforcement "did not have the requisite probable cause to believe that the acquisition of defendant's historical CSLI would lead to evidence of a crime or contraband[.]" Motion to Suppress, 5/23/2024, ¶ 18(c).

The trial court addressed this and several other motions at a hearing on June 18, 2024. Codefendant Allen argued that the separate (and similar) warrant for Allen's CSLI data was invalid because "the presence of a phone in connection with someone who's suspected of a crime is not enough." N.T., 6/28/2024, at 60. "There has to be some sort of indication that the phone was used in the commission of the crime or around the commission of the crime." *Id.* Allen argued that nothing in the affidavit "sa[id] that he was using it in the moments leading up to the robbery" or that "he is using it after." *Id.*

Butler then argued his motion to suppress and joined Allen's argument. *Id.* at 61 ("And I join [the] argument about the general statement that a phone is in the vicinity of a crime is not probable cause, in and of itself, that there was a crime committed."). Separately, Butler argued that "the sole information that purports to implicate Mr. Butler in this crime in this warrant is information that was provided to the Commonwealth purportedly by a confidential source." *Id.* He asserted that the information provided by the source was not sufficiently corroborated. *Id.* at 62 ("[T]his affidavit contains

no information from which a reviewing court could assess the reliability of this confidential source.") Additionally, Butler stated that the source was "relaying information that someone else gave to her." *Id.*

Butler acknowledged that the authorities thereafter searched Johnson-Butler's phone based on this information but argued that the results of the search demonstrated that the source was unreliable. Specifically, the source had relayed that the phone contained an inculpatory admission by Butler, but "the detective did not recover that recording" as the affidavit makes no mention of it. *Id.* at 63. Moreover, he asserted that the remaining information obtained from the search of Johnson-Butler's phone was insufficient, as none of the text messages directly mentioned Butler's name. *Id.* Butler argued:

> And then there's a message from Johnson-Butler, I feel so bad for him, bro; this is not his life; I don't like him around my brother. It's not saying that the brother's involved. It appears to be saying that the person involved has somehow associated in the past with ... Butler or whoever Gieara Johnson-Butler's brother is. This does not indicate when this other person was supposedly around Gieara Johnson-Butler's brother. It doesn't even indicate that Jerry Butler's the brother that's being referred to.
>
> So, Your Honor, the probable cause as it relates to Jerry Butler in this affidavit is completely lacking. And for those reasons, I'd submit that the historical cell site records for his alleged cell phone should be suppressed.

*Id.* at 64.

The trial court addressed the search warrant claim in its written opinion as follows:

- 19 -

In this case, the argument was that probable cause was lacking because the warrant relied only on information provided by the [confidential informant ("CI")], and the reliability of that information was not substantiated. However, a reading of the affidavit of probable cause supports the Commonwealth's characterization. The affidavit does not rely on information provided by the CI as the basis for probable cause. Rather, the [information] given by the CI provided law enforcement avenues for investigation, and from that investigation law enforcement gathered information that supported a probable cause determination. Specifically, the affidavit of probable cause[] set out on page 15[] the meeting that Lieutenant Richard had with the CI, and the information that the CI provided. In part, the CI provided information based upon conversations the CI had with Gieara Johnson-Butler, the sister of Butler, and specifically a conversation the CI had with her regarding her ability to identify Butler in surveillance video, screen shots of a text message conversation the CI had with her, and that she told the CI she had a recording on her cell phone that implicated Butler. The affidavit, next details what action law enforcement took after this conversation with the Cl. They located Johnson-Butler, and [] they seized her cell phone until a search warrant could be obtained. The affidavit of probable cause then set forth what the search warrant for the download of Johnson-Butler's cell phone uncovered. Therefore, this [c]ourt agreed that even if you take out all the references to the confidential informant, there was sufficient evidence to support a finding of probable cause.

Trial Court Opinion, 1/21/2025, at 17-18.

The Commonwealth maintains Butler has waived his claims because his concise statement is vague as to this issue. The Commonwealth observes that Butler raised two distinct arguments at the suppression hearing. First, that "the affidavit failed to connect his phone to the murder, which he now raises on appeal." Commonwealth's Brief at 16. Second, that "the affidavit relied on an uncorroborated confidential informant, which he has abandoned on appeal." *Id.* at 16-17. The Commonwealth points out that the trial court

- 20 -

opinion addressed only the abandoned claim and submits that the fault lies with Butler. *See id.* at 16 ("[Butler]'s concise statement broadly alleged that the search warrant for historical cell data for the phone ending in 5767 lacked probable cause."). In its view, the failure to clearly state in the concise statement that the warrant failed to adequately link the phone to the murder has waived his claim.

We decline to find waiver on this basis, as the concise statement alleged that "law enforcement's acquisition of said historical CSLI constituted a search … not supported by probable cause[.]" Concise Statement, 11/27/2024, ¶ 2. As the Commonwealth recognizes, Butler raised both an argument as to the CI and also joined Allen's argument before the trial court as to the absence of probable cause, the latter of which is the claim presented on appeal. This argument is clearly subsumed by the claim he raised in his concise statement and therefore is not waived. *See Commonwealth v. McKown*, 2013 PA Super 282, 79 A.3d 678, 685 n.5 (Pa. Super. 2013) (declining to find waiver because the "issue is fairly subsumed within" an issue raised in the concise statement).

> On appeal from a denial of a motion to suppress, our review
>
> is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. We are bound by the suppression court's factual findings so long as they are supported by the record; our standard of review on questions of law is de novo. Where, as here, the defendant is appealing the ruling of the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as

remains uncontradicted. Our scope of review of suppression rulings includes only the suppression hearing record and excludes evidence elicited at trial.

*Commonwealth v. McMahon*, 280 A.3d 1069, 1071 (Pa. Super. 2022) (citation omitted).

The Fourth Amendment to the United States Constitution protects privacy interests by requiring search warrants to be based on probable cause.

Search warrants protect privacy in two main ways. First, they ensure that a search is not carried out unless a neutral magistrate makes an independent determination that there is probable cause to believe that evidence will be found. Second, if the magistrate finds probable cause, the warrant limits the intrusion on privacy by specifying the scope of the search—that is, the area that can be searched and the items that can be sought.

*Birchfield v. North Dakota*, 579 U.S. 438, 469 (2016) (citation omitted).

"[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232, (1983). We apply the "totality of the circumstances" test set forth in *Gates* under our constitution. *See Commonwealth v. Gray*, 503 A.2d 921, 922 (Pa. 1985). Probable cause "must be based on common sense non-technical analysis." *Id.* at 925.

Additionally, there must be a nexus between the criminal activity and the proposed search. *See Commonwealth v. Torres*, 177 A.3d 263, 273 (Pa. Super. 2017). Butler's probable cause argument largely focuses on an asserted failure to establish a nexus. He maintains that the Commonwealth

- 22 -

failed to show any link between Butler's cell phone and the crime. He argues that "a valid warrant for … CSLI requires specific facts establishing a fair probability that the sought-after records will yield evidence of a crime, and that the phone number at issue is sufficiently connected to the criminal conduct under investigation." Butler's Brief at 35. He discounts Detective Minzola's recitation of his history and experience with criminals using cell phones on the grounds that probable cause "must be individualized to the suspect and the circumstances of the case; it requires more than generalized statements about human behavior that are unsupported by the specific facts." *Id.* at 36 (quoting *Jacoby*, 170 A.3d at 1084). Hence, Butler maintains that the affidavit "failed to establish any particularized facts tying Butler's phone, or its historical location data, to the alleged offenses." *Id.*

In his view, the affidavit relied entirely on generic assumptions, as it "merely recited the existence of the crime and asserted, in general terms, that cell phone records may assist in the investigation," and failed to show any basis to conclude that Butler himself "was in possession of the phone at relevant times, that his phone was used in connection with the crime, or that the CSLI sought would likely place him at or near the scene during the commission of the offense." *Id.* "Further, there was no showing that law enforcement had independently identified Butler's phone as being in use during or after the alleged incident." *Id.*

We reject Butler's argument that the Commonwealth needed to directly tie the phone itself to the crime. A search warrant may be authorized for "mere evidence" when the affidavit establishes a "nexus between the items to be seized and the suspected crime committed which is necessary for the search and seizure of purely evidentiary items." *Commonwealth v. Butler*, 291 A.2d 89, 90 (Pa. 1972) (citing *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294 (1967)). For nexus purposes, the items to be seized were the records held by Butler's cell phone provider. Thus, the Commonwealth had to establish probable cause to believe that the CSLI records would have evidentiary value.

In *Commonwealth v. Pacheco*, investigators learned a large drug-trafficking organization was smuggling heroin into the United States and that Pacheco "played a significant role in the operation by retrieving the heroin in Atlanta, Georgia, and transporting it to wholesale buyers in New York City." *Commonwealth v. Pacheco*, 263 A.3d 626, 629 (Pa. 2021). Investigators obtained judicial approval to capture real-time CSLI disclosing Pacheco's whereabouts.[5] *Id.* at 632. Pacheco argued, with respect to nexus, that an order obtained under the Wiretap Act was insufficient because the statute "permit[s] a search predicated on a judicial determination regarding the

_____

[5] Although *Pacheco* involved an application under the Wiretap Act granted by a court of common pleas, our Supreme Court held that this was the functional equivalent of a warrant and thus satisfied Fourth Amendment protections. *Pacheco*, 263 A.3d at 652.

likelihood that the surveillance will shed light on a criminal investigation, and not a nexus between the proposed search and particularized criminal activity required to demonstrate probable cause." *Id.* at 642. The Court disagreed:

> [T]he district attorney demonstrated in its application and affidavit the requisite probable cause to believe that the evidence sought would aid in a particular apprehension or conviction for a particular offense. To be precise, the application and affidavit demonstrated probable cause to believe that the CSLI evidence sought from the targeted cell phones, identified by the phone number attached to them, would aid in the apprehension of [Pacheco] for the specific offenses of manufacture, delivery, and/or possession with the intent to deliver a controlled substance, criminal conspiracy, and criminal use of a communication facility. Thus, the Commonwealth established individualized suspicion and a nexus between the real-time CSLI evidence sought and the identified crimes alleged to have been committed by [Pacheco]. The Commonwealth additionally demonstrated in the affidavit that [Pacheco] utilized his cell phone in conducting the drug-trafficking activities.

*Id.* at 648.

Thus, to the extent Butler claims that the Commonwealth was required to establish that the "sought-after records will yield evidence of a crime," i.e, that the phone itself was used to facilitate the crime, he is incorrect. *See* Butler's Brief at 35. As *Pacheco* makes clear, the Commonwealth established a nexus where the CSLI records will "aid in the apprehension" of the defendant if the affidavit establishes probable cause that the defendant committed the offenses alleged.

Evidence that the defendant actually used the phone to further criminal activity, as in *Pacheco*, is certainly a relevant factor. But it is not the sine qua non. In this respect, we are persuaded by the discussion of the

Massachusetts Supreme Court in **Commonwealth v. Hobbs**—a case also cited by the **Pacheco** Court on a separate question[6]—regarding the required relationship between the criminal activity and CSLI records:

> [I]n light of the inseparability of person from cell phone, an affidavit establishing that a suspect committed a crime and that the suspect was known to own or use a particular cell phone, along with the reasonable inferences drawn therefrom, demonstrates a substantial basis to believe that the CSLI from that cell phone was "related to the criminal activity under investigation, and that [the CSLI] reasonably may be expected to be located in the place to be searched at the time the search warrant issues." **More precisely, the location of a suspect's cell phone at the time of the criminal activity provides evidence directly related to his or her participation, or lack thereof, in the criminal** activity, and the location of the cell phone at that time can reasonably be expected to be found in the CSLI records requested.
>
> Consequently, there is a sufficient nexus between the criminal activity for which probable cause has been established and the physical location of the cell phone recorded by the CSLI of the person the applicant has probable cause to believe has committed the offense, at least for the time and place of the criminal activity. A direct observation of a suspect's actual use of the cell phone during the commission of the crime is thus not required to establish the requisite nexus between the crime and CSLI.

**Commonwealth v. Hobbs**, 125 N.E.3d 59, 69-70 (Mass. 2019) (emphasis added; citations omitted).

Here, the affidavit set forth sufficient facts for a Magisterial District Judge to conclude there was probable to believe that Butler's cell phone provider would have historical CSLI records relevant to establishing Butler's

_____

[6] The **Pacheco** Court cited **Hobbs** in its discussion of the difficulty in defining the permissible timespan for CSLI searches. **See Pacheco**, 263 A.3d at 650.

participation in the conspiracy to rob and murder Carter.[7]  The affidavit linked Butler's codefendants to the murder, and the affidavit established probable cause to believe that Butler was with those codefendants and involved in their scheme.  Therefore, the affidavit set forth the required nexus between Butler's cell phone number, the crime, and the CSLI records.

Finally, we do not agree that the Commonwealth was required to establish more direct evidence of Butler's possession of a cell phone.  The magistrate could credit the commonsense determination that Butler, who was known to have a cell phone, was likely to be carrying his cell phone on his person over the requested time period.  In **Commonwealth v. Choice**, we addressed a geofencing warrant, a process by which law enforcement obtains "location history … data from cellular devices present at the time and place of the crime[.]"  **Commonwealth v. Choice**, 345 A.3d 719, 722 (Pa. Super. 2025).  These "warrants effectively work in reverse from traditional search warrants," as law enforcement supply a specific location and period of time, and the phone companies provide a list of cell phones and users matching the parameters.  **Id.** at 722 n.2 (citation omitted).

Choice argued, among other points, that the Commonwealth failed to sufficiently establish probable cause to believe that the perpetrator of a

_____

[7] In reaching this conclusion, we do not address whether the Commonwealth's probable cause for the CSLI records was limited to the day of the murder itself. That concept is raised in Butler's overbreadth argument, which we discuss infra.

- 27 -

shooting possessed a cell phone. We disagreed, concluding that "the Commonwealth was not required to set forth 'concrete evidence' that [Choice] was using a cell phone with Android-based location services." *Id.* at 739.

> Instead, the Commonwealth appropriately relied on the "fair probability" standard, borne out by the ubiquity of cell phone usage, that a majority of cell phone users utilize Android-based services, and that [Choice] likely possessed such a device. Because pervasive cell phone possession and cell phone service usage is a matter of common knowledge, and because law enforcement combined this common knowledge with specific factual circumstances regarding the time and place of the crime, we reject [Choice]'s argument that the December 2020 search warrant relied upon "categorical assumptions."

*Id.* at 739–40 (footnote omitted).

This analysis readily extends to the present scenario. Indeed, the reason that cell phone users have a reasonable expectation of privacy in historical CSLI records held by a third-party service provider is because users "compulsively carry cell phones with them all the time." *Carpenter v. United States*, 585 U.S. 296, 311 (2018). Thus, "when the [g]overnment tracks the location of a cell phone it achieves near perfect surveillance, as if it had attached an ankle monitor to the phone's user." *Id.* at 311-12. That analysis relies on the notion that a cell phone user is exceedingly likely to be carrying his or her phone. Thus, as in *Choice*, the combination of this commonsense notion, when paired with evidence that Butler had and used a cell phone, was associated with his codefendants, and tied him to the robbery/murder, supplied probable cause.

Butler's second argument is that the search warrant was overbroad because the Commonwealth requested and received historical CSLI dating from January 8, 2024 through January 26, 2024. We conclude that Butler waived this claim by failing to seek suppression on that basis.

"If there is probable cause to search, the warrant must be properly limited in scope." *Commonwealth v. Ani*, 293 A.3d 704, 716 (Pa. Super. 2023). This concept addresses the particularity requirement of the United States Constitution and the Pennsylvania Constitution. "Although some courts have treated overbreadth and ambiguity as distinct defects in warrants, both doctrines diagnose symptoms of the same disease: a warrant whose description does not describe as nearly as may be those items for which there is probable cause." *Commonwealth v. Grossman*, 555 A.2d 896, 899-900 (Pa. 1989) (citation omitted).

Butler complains that the warrant was overbroad because it "describes criminal activity that occurred between January 20, 2024, and nothing before. Nevertheless, the warrant sought, and law enforcement obtained, historical CSLI for Butler's phone dating back to January 08, 2024." Butler's Brief at 42.

"[I]n any assessment of the validity of the description contained in a warrant, a court must initially determine for what items probable cause existed. The sufficiency of the description must then be measured against those items for which there was probable cause." *Grossman*, 555 A.2d at

900. Butler's overbreadth argument appears to be that, at most, the Commonwealth would be entitled to CSLI for January 20, 2024, and only that date. Butler's Brief at 43 ("There is simply nothing in the warrant even resembling probable [cause] to justify law enforcement's request to review a record of ... Butler's every movement for the nearly two-week period preceding the criminal activity of January 20, 2024[.]").[8]

Our review of the record reveals that Butler failed to argue this point to the trial court. His motion to suppress merely alleged that "said invalid warrant was overbroad and further failed to identify with particularity the information sought to be search[ed] for and seized[.]" Motion to Suppress, 5/23/2024, ¶ 18(b). Nowhere did he argue that the timeframe for which the CSLI was sought was unsupported by probable cause, and his generic argument failed to alert the court to the nuanced overbreadth issue[9] he now

_____

[8] Butler's brief does not discuss the Commonwealth's request for historical CSLI records from January 21 through January 26.

[9] As noted, the overbreadth argument presented on appeal seemingly concedes, at least for purposes of the overbreadth claim, that the affidavit presented sufficient probable cause with respect to the day of the murder itself. In **Ani** we held that the affidavit to search a cell phone established probable cause as to some items but not others. Applying the severability doctrine, we suppressed only those items for which there was not probable cause.

Butler maintains that "all evidence derived from the defective warrant should have been suppressed[.]" Butler's Brief at 44. In support, he cites **Grossman**, in which an overbroad warrant resulted in suppression of all evidence. The **Grossman** Court did not address severability; furthermore, *(Footnote Continued Next Page)*

presents on appeal. *See* Pa.R.Crim.P. 581(D) ("The motion shall state specifically and with particularity the evidence sought to be suppressed, the grounds for suppression, and the facts and events in support thereof."). We thus conclude that Butler has waived his claim.

## Unconstitutionality of LWOP

Butler's final issue presents an argument that the sentence of mandatory LWOP is unconstitutional. In *Commonwealth v. Rivera*, 238 A.3d 482 (Pa. Super. 2020), we rejected the claim that the Eighth Amendment to the United States Constitution forbids a sentence of LWOP for second-degree murder. In *Commonwealth v. Zettlemoyer*, 454 A.2d 937, 967 (Pa. 1982), our Supreme Court held that our charter's provision against cruel

---

the warrant at issue there sought to seize "all files." *Grossman*, 555 A.2d at 900. In *Ani*, we noted that the warrant there "did not authorize a search of 'any and all data' on the phone." *Ani*, 293 A.3d at 730. The warrant here did not seek all CSLI for every day of Butler's life, and, as noted, Butler seemingly concedes that probable cause existed with respect to the requested items as to the date of Carter's murder.

Finally, as previously noted, in *Pacheco*, our Supreme Court stated: "As other courts have recently observed, 'defining the permissible parameters of time for CSLI searches that are justified by probable cause is difficult,' and each case involves a fact-intensive inquiry that must be resolved based on the particular facts presented." *Pacheco*, 263 A.3d at 650 (quoting *Hobbs*, 125 N.E.3d at 71).

Thus, the question of overbreadth could be multifaceted. By failing to specifically define the basis of his argument that the warrant was overbroad, Butler deprived the trial court of its opportunity to consider and decide whether the timeframe for CSLI requested by the Commonwealth was supported by probable cause. It also denied the trial court the first opportunity to answer the question of severability.

punishment is coextensive with the Eighth Amendment to the United States Constitution.

In **Commonwealth v. Lee**, 301 A.3d 899 (Pa. Super. filed June 13, 2023) (non-precedential decision),[10] this Court concluded that **Rivera** remained good law and had not been undermined by subsequent United States Supreme Court caselaw. We also concluded that **Zettlemoyer** remained good law, and thus Lee's claim under our Constitution likewise failed.

Our Supreme Court granted Lee's petition for allowance of appeal on both questions. **See Commonwealth v. Lee**, 313 A.3d 452 (Pa. 2024). Butler states that "the Supreme Court's resolution of [**Lee**] will likely be dispositive of [Butler]'s constitutional challenges to the sentence imposed." Butler's Brief at 46.

We are persuaded by the **Lee** Court's conclusions that the **Rivera** and **Zettlemoyer** cases remain binding on this Court. Therefore, unless and until our Supreme Court overrules those precedents in **Lee**, Butler's claims on this issue fail.

Judgment of sentence affirmed.

_____

[10] We may cite non-precedential decisions of this Court filed after May 1, 2019, for persuasive value. **See** Pa.R.A.P. 126(a).

Judgment Entered.

Benjamin D. Kohler

Benjamin D. Kohler, Esq.
Prothonotary


Date: <u>2/3/2026</u>